# EXHIBIT 2

**THOMPSON COBURN LLP**
**LUKAS SOSNICKI, CSB 295895**
**lsosnicki@thompsoncoburn.com**
**10100 Santa Monica Blvd., Suite 500**
**Los Angeles, California 90067**
**Tel: 310.282.2500 / Fax: 310.282.2501**

Attorneys for Defendant CHARTER COMMUNICATIONS, INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

BARBARA BARBER, ANTONIO DUENAS, ALFRED HOLGUIN, and ANDREW EPSTEIN, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC., d/b/a SPECTRUM,

Defendant.

CASE NO. 2:25-cv-12361

*The Hon. Mark C. Scarsi*

**DECLARATION OF MARK MATTINGLY IN SUPPORT OF CHARTER COMMUNICATIONS, INC.'S MOTION TO COMPEL ARBITRATION, STRIKE CLASS ALLEGATIONS, AND TO STAY, OR, IN THE ALTERNATIVE, DISMISS PLAINTIFFS' CLAIMS**

Date: March 23, 2026
Time: 9:00 a.m.
Place: Courtroom 7C

# DECLARATION OF MARK MATTINGLY

I, Mark Mattingly, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows in support of Defendant's Memorandum in Support of its Motion To Compel Arbitration, Strike Class Allegations, and To Stay, Or In The Alternative, Dismiss Plaintiffs' Claims.

1. I am an adult over 18 years of age, of sound mind, and competent in all respects to make this Declaration. I make this Declaration based upon my personal knowledge. If called and sworn as a witness, I could and would competently testify to the matters discussed in this declaration.

2. I am a Partner at Thompson Coburn LLP.

3. Thompson Coburn LLP represented Charter Communications Inc. (**Charter**) in an American Arbitration Association (**AAA**) Consumer Mass Arbitration captioned: *Individual Claimants vs. Charter Communications, Inc. d/b/a Spectrum*, Case No. 01-24-0009-0630 (the **Mass Arbitration**).

4. The Mass Arbitration was comprised of individual claims asserted by Charter Subscribers (the **Claimants**) against Charter. Each Claimant, including Plaintiffs in this case, filed individual "Petitions" against Charter with the AAA. Claimants' filing of the Petitions with the AAA was completely voluntary and not compelled by motion practice.

5. Evan Murphy of Murphy Advocates LLC and Maurice Mitts of Mitts Law LLC served as legal counsel for the Claimants.

6. Barbara Barber was one of the Claimants in the Mass Arbitration. On or about December 10, 2024, Barber filed a "Petition" against Charter with the AAA. True and correct copies of Barber's Petition and the "The Spectrum Residential General Terms and Conditions of Service Agreement" attached as Exhibit A in the Petition are attached to my Declaration as Exhibit I.

7. Antonio Duenas was one of the Claimants in the Mass Arbitration. On or about December 10, 2024, Duenas filed a "Petition" against Charter in the Mass

Arbitration proceedings before the AAA. As with Barber, Duenas attached the "The Spectrum Residential General Terms and Conditions of Service Agreement" as Exhibit A to his Petition. A true and correct copy of Duenas' Petition is attached to my Declaration as Exhibit J.

8. Andrew Epstein was one of the Claimants in the Mass Arbitration. On or about December 10, 2024, Epstein filed a "Petition" against Charter in the Mass Arbitration proceedings before the AAA. As with Barber, Epstein attached the "The Spectrum Residential General Terms and Conditions of Service Agreement" as Exhibit A to his Petition. A true and correct copy of Epstein's Petition is attached to my Declaration as Exhibit K.

9. Alfred Holguin was one of the Claimants in the Mass Arbitration. On or about December 10, 2024, Holguin filed a "Petition" against Charter in the Mass Arbitration proceedings before the AAA. As with Barber, Holguin attached the "The Spectrum Residential General Terms and Conditions of Service Agreement" as Exhibit A to his Petition. A true and correct copy of Holguin's Petition is attached to my Declaration as Exhibit L.

10. On February 12, 2025, the AAA appointed the Hon. Dennis M. Cavanaugh to serve as a process arbitrator for the Mass Arbitration. Judge Cavanaugh previously served as a magistrate judge and district court judge for the United States District Court for the District of New Jersey.

11. After Judge Cavanaugh was appointed as process arbitrator, Charter and the Claimants both submitted extensive briefing, consisting of an opening brief and responsive brief from each side, on various issues, including the proper forum for Plaintiffs' claims.

12. Judge Cavanaugh issued an Order & Opinion dated July 23, 2025, on the issues presented. A true and correct copy of the Order & Opinion is attached to my Declaration as Exhibit M.

13. In the Order & Opinion, Judge Cavanaugh held, among other things, that

"Individual Claimants' cases should be closed and that the parties should proceed in small claims court." Ex. M at 24.

14. On or about August 4, 2025, the AAA closed the Mass Arbitration.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on February 16, 2026 in St. Louis, Missouri.

____________________________

Mark Mattingly

# EXHIBIT I

PETITION # **935**

**VIA US MAIL**

VP and Associate General Counsel, Litigation
Charter Communications
12405 Powerscourt Drive
St. Louis, MO 63131

**RE: DEMAND FOR ARBITRATION AND OPT-OUT NOTICE**

**Client Address:** [redacted]

**Client Phone Number:** [redacted]

## PETITION

**Barbara Barber**, ("Claimant"), through counsel, files this Petition against Charter Communications Inc. d/b/a/ Spectrum ("Spectrum") and, in support of this Petition, states the following. This demand seeks damages up to $10,000.00. Pursuant to the arbitration agreement, Claimant requests that Respondent pay all American Arbitration Association ("AAA") filing fees, administration fees, hearing fees, and/or other fees.

Pursuant to Claimant's rights under the arbitration agreement, Claimant hereby chooses that the arbitration will be conducted solely on documents submitted to the arbitrator; however, reserves the right to demand a telephonic hearing or in-person hearing.

## ARBITRATION JURISDICTION

The Spectrum Residential General Terms and Conditions of Service Agreement ("Agreement" and Exhibit A) contains an arbitration provision that requires disputes to be administered by the AAA. The AAA Rules require Claimant to serve Spectrum and Claimant has served a copy of this Petition at the address listed above. As this condition has been met, Claimant brings this arbitration.

## INTRODUCTION AND GENERAL ALLEGATIONS

While Spectrum advertises certain prices for their monthly cable plans, Spectrum then adds unexpected hidden charges including the "Broadcast TV Surcharge" (hereinafter referred to as the "BTS"). Since the inception of the BTS in 2010 of $1.00 per month, the BTS has increased to $25.75 per month beginning January 30, 2024 – a 2575% increase in 14 years. That amounts to a $309.00 increase to each customer annually. The cost to access local broadcast television has not increased by nearly 26x in the last 14 years and, in fact, access is free outside of using a cable plan.

Spectrum's advertising does not contemplate the inclusion of the BTS. Any customer looking to purchase a Spectrum plan would see a monthly advertised price and understandably conclude that it included all of the channels that the plan purports to include in the monthly price:




*See also* Exhibit B. Exhibit B is direct advertising from Spectrum's website that includes all of Spectrum's monthly plans without any mention of the BTS - even by reference in a footnote. Neither the Agreement nor Spectrum's advertising disclosures incorporate, by reference or otherwise, a fee schedule or proper disclosure of the BTS to include how much is charged, when it's charged, and that Spectrum retains the right to unilaterally change the amount of the BTS.

Only when someone becomes aware of the BTS and actively searches for an explanation of the BTS, do they discover any disclosure. Such disclosure, by way of example, only assists Spectrum in accomplishing their scheme. *See* Exhibit C. Spectrum describes the BTS as a pass-through fee requiring Spectrum to charge the BTS to its customers. And Spectrum imposes the BTS upon each customer whether they watch broadcast TV or not. *Ibid.* The disclosure further provides an unfair and deceptive explanation as to why the customer is being charged the BTS and expressly fails to tell the customers that, absent using a Spectrum account, the customer can access broadcast television free of charge. In actuality, the BTS was concocted by Spectrum as an unlawful mechanism to increase their revenue.

Spectrum should have accurately stated the true monthly prices for its cable plans in its price representations and advertising. Spectrum failed to do so. Spectrum's BTS scheme has enabled, and continues to enable, Spectrum to effectively increase its rates without having to publicly announce those higher rates.

**<u>COUNT 1 - California Consumers Legal Remedies Act §§ 1750 et seq.</u>**

1. All of the foregoing allegations are restated as if fully set forth herein.
2. Claimant purchased a Spectrum cable plan for personal, family, or household purposes.

3. As described above and incorporated herein, Spectrum deceived its customers by advertising one price for its monthly cable plans and subsequently including the BTS that is nothing more than a revenue grab.
4. Spectrum failed to disclose the existence of the BTS in its advertising and its Agreement and further failed to properly disclose the BTS on its website by disclosing the BTS to deceive its customers into believing that the fee is a pass-through mandated fee.
5. Spectrum has violated California Consumers Legal Remedies Act §§ 1750 et seq. by acting unfairly and/or deceptively in its dealings with Claimant.
6. Claimant has suffered ascertainable financial damages by the unfair and deceptive trade practices of Spectrum.

**PRAYER FOR RELIEF**

WHEREFORE, Claimant requests the relief as specified herein:

- For an order awarding Claimant compensatory damages and statutory damages, including punitive damages, and all other sums of money owed, together with interest on these amounts;
- For preliminary, permanent, and mandatory injunctive relief prohibiting Respondent and its affiliates from charging its customers the BTS in the future;
- For pre- and post-judgment interest;
- For an award of reasonable attorneys' fees and costs as provided by the Agreement and/or other applicable law state or federal law;
- For all costs of suit; and
- For such other and further relief as the Arbitrator deems just and proper.

Respectfully Submitted,

By: /s/ *Evan Murphy*
Murphy Advocates LLC
Evan Murphy, Co. Bar No. 33563
1600 Broadway, Suite 1600
Denver, CO 80202
(314) 753-5212
evan@murphyadvocates.com

/s/ Maurice Mitts
Mitts Law LLC
Maurice Mitts, PA Bar No. 50297
1822 Spruce Street
Philadelphia, PA 19103
(215) 866-0110
mmitts@mittslaw.com
215-866-0110

*Attorneys for Claimants*

# Spectrum Residential General Terms and Conditions of Service

Subscriber ("Subscriber", "you" or "your") agrees to be bound by these Residential General Terms and Conditions of Service with respect to all residential services provided by Spectrum ("Services"), and by the additional terms of service and posted policies applicable to the Services to which you subscribe and posted at www.spectrum.com/policies and incorporated herein by reference (collectively referred to as "Terms of Service"). These Terms of Service also incorporate by reference Spectrum's Privacy Policy located at www.spectrum.com/privacy, which governs the collection, use and disclosure of Subscriber personal information. All references to "Spectrum" in these Terms of Service mean Charter Communications Operating, LLC, its parents, affiliates or subsidiaries providing Subscriber the Services, as well as third parties Spectrum may retain to provide the Services.

If Spectrum provides Spectrum Voice™ service in Subscriber's area, it will be provided through the Spectrum phone service affiliate servicing Subscriber's area.

Feedback

These Terms of Service do not apply to services sold under the Spectrum Business brand.

**THESE TERMS OF SERVICE CONTAIN (1) A BINDING ARBITRATION PROVISION, WHICH INCLUDES A WAIVER OF YOUR RIGHT TO BRING CLAIMS AS CLASS ACTIONS; (2) A LIMITATION ON YOUR RIGHT TO BRING CLAIMS AGAINST SPECTRUM MORE THAN 1 YEAR AFTER THE RELEVANT EVENTS OCCURRED; AND (3) THE RIGHT TO OPT OUT OF THE FOREGOING PROVISIONS. THESE PROVISIONS AFFECT SUBSCRIBER'S RIGHTS UNDER THESE TERMS OF SERVICE WITH RESPECT TO ALL SERVICES. SEE SECTION 30 FOR DETAILS ON THESE PROVISIONS.**

1. Introduction

a. Acceptance. Subscriber accepts these Terms of Service by doing any of the following: (i) written or electronic signature; (ii) informing Spectrum electronically or

orally of such acceptance; (iii) activating a Service, Equipment or Device; (iv) breaking the seal on any package or box containing any Equipment or Device; or (v) use of or payment for, in whole or in part, the Service, Equipment or Device. When Subscriber accepts this Agreement, Subscriber is representing that Subscriber is at least eighteen (18) years old and legally able to accept a binding contract. This is a binding legal document and Subscriber should regularly consult www.spectrum.com/policies for updates.

b. Use of Services. Subscriber agrees that the Services will be used only for Subscriber's personal, residential, non-commercial purposes, unless otherwise specifically authorized by Spectrum in writing. You are prohibited from reselling or permitting another to resell the Services in whole or in part, or using or permitting another to use the Services, directly or indirectly, for any unlawful purpose or in violation of applicable law. Subscriber agrees and acknowledges that these Terms of Service apply to all persons who use the Services and that you shall have sole responsibility for ensuring that all other users of the Services understand and comply with the Terms of Service.

c. Amendments; Notices. To the fullest extent permitted under applicable law, Spectrum may in its sole discretion modify any aspect of the Services or these Terms of Service and will post such changes on www.spectrum.com/policies. Spectrum will provide written notice of any material changes to the Services or these Terms of Service at least 15 days in advance or any longer period required under applicable law by either: (i) sending via mail or hand delivery to Subscriber's address of record; (ii) e-mailing to Subscriber's e-mail of record; or (iii) including a message in your monthly billing statement. Subscriber agrees that any one of the foregoing methods notice constitute sufficient and effective notice under these Terms of Service. If you disagree with a change to these Terms of Service, you have the right to cancel the Services; provided, that your continued use of the Services for more than 30 days after we deliver notice of a change will constitute your acceptance of the change.

2. **Charges and Billing**

a. Payment of Charges: Billing may commence on or after the earlier of (i) the activation of any Service or Device, or (ii) 8 days after either customer pickup or shipment by Spectrum of Equipment or Devices. Subscriber agrees to pay all charges associated with the Service, including, but not limited to, charges for installation, service calls, live-agent customer assistance, monthly subscription service, Equipment fees, measured and per-call charges, applicable federal, state, and local taxes and fees, fees to recoup any applicable municipal, state and federal

government fees, permitted fees and cost recovery charges, including without limitation, public, educational, and governmental access, universal service, telecom relay services for the visually/hearing impaired, rights-of-way access, and programs supporting the 911/E911 system and any fees or payment obligations imposed by governmental or quasi-governmental bodies for the sale, installation, use, or provision of the Services. If partial payment is made of any bill and without waiving its right to collect the full balance owed, Spectrum will apply that payment to any outstanding charges in the amounts and proportions that it determines.

b. Monthly Subscription Services: Subject to restrictions under applicable law, if any, and without abrogating Section 5 - "Spectrum Refund Policy/30-Day Guarantee," Subscriber shall be responsible for the full monthly charge (without pro-ration) for those Services that are offered on a monthly subscription basis to which the Subscriber has subscribed, regardless of Subscriber's termination of such monthly Service prior to the conclusion of the current monthly subscription service period, and for usage charges for per program, Pay Per View, On Demand, per event or program Video Services ordered or per unit, minute, or data usage charges used by the Subscriber or other Services ordered where charges are based on actual usage or on orders placed during the previous month (collectively “Usage Charges”). To the extent Subscriber’s Usage Charges exceeds a threshold amount, as solely determined by Charter, then such Usage Charges may be charged to Subscriber and become due prior to the end of the monthly billing period. Unless Subscriber cancels Service on o before the last day of the current monthly subscription service period, Subscriber wil be charged in full for Services the next monthly subscription service period. The monthly subscription service period can be found in Subscribers billing statement.

c. Disputed Charges/Late Payments: To the extent permitted under applicable law, if you disagree with a charge on your billing statement, you must contact Spectrum at 1-855-757-7328 no later than 60 days after the due date on your billing statement or you waive any such dispute. Failure to pay charges by the due date on the billing statement (including checks returned for insufficient funds) may result in suspension or disconnection of all Services, the removal of all Equipment and/or imposition of a late payment or service charge. If Subscriber has more than one account (business and/or residential) served by Spectrum, all Spectrum-provided Services at all locations may be subject to suspension or disconnection of Service in the event any one account remains delinquent and Spectrum may apply any funds received from Subscriber first to such delinquent account(s). Should Subscriber wish to resume Service after any suspension, Subscriber may be subject to reconnection fees. Should Subscriber wish to resume Service after termination of Service, Spectrum may

charge fees for installation, service calls and/or activation and reserves the right to charge rates different from those in place at the time of disconnect. These fees are in addition to all past due charges and other fees. In the event collection activities are required, additional collection charges may be imposed.

d. No Credit Arrangements: Subscriber agrees and understands that by entering into the financial arrangement described herein, except to the limited extent Subscriber is purchasing a Device from Spectrum under an installment plan agreement, Spectrum is not extending Subscriber any credit and therefore Spectrum and Subscriber are not entering into a consumer credit or similar transaction.

3. Electronic Payment Terms. Unless you subscribe to Spectrum's Mobile Service, you may elect to make a one-time payment to be applied against the balance of your monthly billing statement through an electronic funds transfer or a debit or credit card charge. You may also elect to pay the balance of your monthly billing statement on a recurring basis, including charges that are due immediately, by enrolling in the Auto Pay Service (collectively, the Electronic Payment Services). Spectrum Mobile subscribers must enroll in the Auto Pay service as a condition to receiving Mobile Services.

a. One Time Pay Authorization: By electing the One Time Pay service, you authorize Charter to charge/debit the bank account, debit or credit card that you designated ("Payment Method") to make a one-time payment in the amount requested by you.

b. Auto Pay Authorization: By enrolling in the Auto Pay Service, Subscriber authorize Spectrum to charge/debit electronically your Payment Method each month to pay th balance due on your account on the due date shown on your monthly bill statement, including charges that are due immediately. Spectrum will continue to charge/debit your Payment Method each month unless you cancel your authorization at least three (3) business days before the next scheduled payment date.

c. By using the Electronic Payment Services, you (i) represent that you are legally authorized user of the Payment Method and (ii) authorize Spectrum to store your Payment Method for future use. Subscriber is responsible for ensuring that the Payment Method information is current and accurate at all times. Subscriber must notify Spectrum of any change in the Payment Method at least three (3) business days before the scheduled due date shown on your monthly billing statement for the month in which you want to make the change. If the change is made after this time, the change will not take effect until the following billing cycle for your monthly billing

statement. In the meantime, Subscriber will remain responsible for taking appropriate actions to ensure that your monthly billing statements are paid when due.

d. Spectrum will notify you prior to the payment due date. The amount shown as due on the monthly billing statement will constitute notice of any variance in amount paid in the previous month. The balance shown as due on your statement view will be deducted on or around the payment due date.

e. Subscriber has the right to revoke the recurring Auto Pay arrangement with Spectrum at any time, except for those services where Auto Pay is required. Any revocation of your authorization to pay amounts due through the Auto Pay service will not take effect until after receipt by Spectrum, and will result in the discontinuance of Auto Pay bill payment(s). After cancelation of Auto Pay bill payment, you will be responsible for taking appropriate action to pay all amounts due as set forth on your billing statement.

f. To get a copy a Subscriber's online Auto Pay confirmation for Subscriber's records, Subscriber must print or save such document to Subscriber's computer.

g. Subscriber must notify Spectrum of any change in account information or Payment Method. Subscriber can update account or Payment Method information on the My Spectrum application, or Spectrum.net/myaccount, or while speaking with one of our service representatives. It may take at least one billing cycle to update your new Payment Method. In the meantime, you will remain solely responsible for taking appropriate actions to ensure that payments are made when due. The Electronic Payment Services are provided for personal, non-commercial use only, and Subscriber is prohibited from using these services for any illegal activity or purpose, including payment fraud or identity theft.

h. You agree that Spectrum may provide you legal notices regarding the Electronic Payment Services, payments made, and other relevant information or records attributable to your payment transactions. Subscriber may not revoke consent to receive such electronic notice, records, or disclosures.

i. It is Subscriber's responsibility to protect the confidentiality of any user name or password used in connection with the Electronic Payment Services. Subscriber shall not provide access to the Electronic Payment Services to anyone other than household members or delegated authorized users. If Subscriber believes Subscriber's password or other means to access the Electronic Payment Services has

been lost, stolen, or otherwise compromised, Subscriber must notify Spectrum immediately at 855-757-7328.

j. Spectrum shall have no liability or responsibility for its inability to process or receive payments Subscriber makes or attempts to make using the Electronic Payment Services or otherwise to perform its responsibilities under this Section 3 in the event circumstances beyond Spectrum's control prevent Spectrum from doing so or otherwise affect Spectrum's ability to do so.

k. Subscriber is responsible for all fees and costs related to maintaining a valid Payment Method including processing charges or annual costs.

l. Subscribers use of the Electronic Payment Services, whether through Spectrums websites, interactive voice response systems or through any other means, is for Subscribers exclusive personal use. No payment processor or any other third party may use the Electronic Payment Services to make payments on behalf of Subscriber without Spectrum's written consent. Any attempt to do so will be considered an unauthorized interference with the intended operation of the Electronic Payment Services and may result in Spectrum's failure to process or accept payments from you.

SPECTRUM'S SOLE AND ENTIRE LIABILITY AND SUBSCRIBER'S EXCLUSIVE REMEDY FOR THE PROCESSING OR DEDUCTION OF AN INCORRECT TRANSFER OF FUNDS HEREUNDER SHALL BE THE RETURN TO YOU OF THE IMPROPERLY TRANSFERRED FUNDS. FOR THE AVOIDANCE OF DOUBT, THIS SECTION 3 DOES NOT LIMIT ANY NON-WAIVABLE RIGHTS SUBSCRIBER MAY HAVE UNDER APPLICABLE LAW.

4. Payment by Check; Returned Items; Third Party Processing: If Subscriber makes payment by check, Subscriber authorizes Spectrum to collect such payment electronically. Subscriber may not amend or modify these Terms of Service with any restrictive endorsements (such as "paid in full"), releases, or other statements on or accompanying checks or other payments accepted by Spectrum; any of which notations shall have no legal effect. Whether paying by check, Electronic Payment Services, or any form of electronic funds transfer from a banking account, Subscriber hereby authorizes Spectrum to collect any declined amount electronically from the subject account. In addition, Subscriber's Service may be suspended and/or terminated.

Subscriber shall be responsible for any payment processing fees incurred when using a third party to process Subscriber's payments to Spectrum. Any NSF charge is in addition to any charges Subscriber's financial institution may assess. If initially rejected, Spectrum will make additional multiple attempts to execute such electronic payment for up to 30 days following the initial refusal. At the end of the 30-day period, if there has not been a successful payment then Subscriber's Electronic Payment Services will be terminated.

5. Spectrum Refund Policy/30-Day Guarantee. Subject to additional provisions that may be applicable to equipment returns, new Subscribers (those who have not been Spectrum customers for 90 days prior to subscription) qualify to have all levels of subscription Service refunded/credited if not fully satisfied with the Service. Current Subscribers adding a new level of subscription Service qualify to receive a refund/credit only on those newly added Services not received within the previous 90 days. Such refund is valid for customers who pay for their first month of new or upgraded monthly recurring subscription Services. Pay-Per-View and other non-recurring subscription purchases are not refundable. Subscriber is limited to one refund or credit per household for a maximum of 30 days of Service. Refunds/credits will be given only when request for cancellation of Service is received by Spectrum within 45 days of Billing Commencement 30 days from Billing Commencement, plus 15 day grace period. Any Equipment associated with the new subscription must be returned prior to release of refund/credit. Any state taxes, franchise fees and other fees or charges that may apply are the responsibility of the Subscriber and will not b refunded or credited. Other restrictions per any offer apply.

6. Service Bundle Discounts: Spectrum reserves the right to offer and Subscriber may elect to subscribe to a combination of Services for which a bundle discount applies ("Bundled Services"). In the event Subscriber terminates any Service component of such Bundled Services or Spectrum terminates such Service component based on Subscriber's failure to comply with the Terms of Service, Spectrum reserves the right to revert the pricing of the remaining Service(s) to the applicable undiscounted price for such Service(s).

7. Spectrum Property: Spectrum Property includes all new or reconditioned equipment that Spectrum provides or leases to you, including, but not limited to, cabling or wiring (except for Wiring, as defined below) and related electronic devices, modems, routers, and any other hardware and includes all software and programs contained within Spectrum Equipment, downloaded to Subscriber by Spectrum or downloaded by Subscriber as directed by Spectrum ("Equipment"). Except for Subscriber Property

as set forth in Section 10 and "cable home wiring" as defined at 47 C.F.R.§76.804 (“Wiring”), all Equipment remains the exclusive property of Spectrum.

Equipment and Wiring installed at the Subscriber's address are intended to remain at Subscriber’s address and must not be used or relocated off such premises without Spectrum authorization. Subscriber must return all Equipment upon substitution of use or termination of Service. Failure to do so will result in a charge to be determined in accordance with Spectrum's then current schedule of charges for unreturned Equipment, which amount shall be due immediately (“Unreturned Equipment Fee”). Subscriber agrees to pay such fee whether the Equipment is lost (through theft or otherwise), damaged or destroyed. For the avoidance of doubt, Spectrum retains all title to all Equipment, at all times, including but not limited to after payment on an Unreturned Equipment Fee. Spectrum in no way relinquishes ownership of (including title to) Equipment by the payment of an Unreturned Equipment Fee even if an Unreturned Equipment Fee has been paid.

8. Disruption of Service: All Services are provided on an "AS IS" and "AS AVAILABLE" basis. In no event shall Spectrum be liable for any failure or interruption of Service, including without limitation those failures and interruptions resulting in part or entirely from circumstances beyond Spectrum's reasonable control. To the extent permitted under applicable law, Spectrum may give credit with respect to Subscriber's recurrin~ monthly subscription fee for qualifying outages of Services.

9. Equipment: Subscriber expressly agrees to use the Equipment exclusively in connection with the Services. Spectrum may remove or change the Equipment at o discretion at any time the Services are active or following the termination of Services. Subscriber further agrees not to sell, lease, abandon, or give away the Equipment, or permit any other service provider to use the Equipment, including Equipment for which an Unreturned Equipment Fee has been paid. SUBSCRIBER UNDERSTANDS AND ACKNOWLEDGES THAT ANY ATTEMPT TO INSTALL OR USE THE EQUIPMENT OR SERVICES AT A LOCATION OTHER THAN SUBSCRIBER’S AUTHORIZED ADDRESS OF RECORD, UNLESS EXPRESSLY AUTHORIZED BY SPECTRUM, SERVICES MAY FAIL TO FUNCTION OR MAY FUNCTION IMPROPERLY. Spectrum will repair and/or replace damaged or defective Equipmentas long as such damage or defect was not caused by misuse or other improper operations or handling by Subscriber. A service charge may be imposed upon the dispatch of a technician if there is damage to Equipment due to negligent use or abuse or if no fault is discovered in Spectrum's system or Equipment.

ALL EQUIPMENT AND, WIRING ARE PROVIDED "AS IS", UNLESS OTHERWISE PROHIBITED OR RESTRICTED UNDER APPLICABLE LAW, AND SPECTRUM HEREBY SPECIFICALLY DISCLAIMS ANY AND ALL EXPRESS AND IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTIBILITY, NON-INFRINGEMENT, TITLE, AND FITNESS FOR A SPECIFIC PURPOSE.

TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, SPECTRUM SHALL NOT BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES (INCLUDING WITHOUT LIMITATION, LOST BUSINESS, REVENUE, PROFITS, OR GOODWILL) ARISING FROM THE USE, DEPLOYMENT, AND/OR FUNCTIONALITY OF ITS EQUIPMENT OR WIRING.

Spectrum's sole obligation and Subscriber's sole remedy with respect to any liability or damage caused by Subscriber's use or deployment of Equipment or Wiring shall be a refund of fees paid by Subscriber for such Equipment for the previous billing month/cycle.

10. Subscriber Property: Excluding the Equipment, Subscriber Property includes all software, hardware, equipment, devices or services used in connection with the Services. Subscriber Purchased Devices also include equipment or devices that Subscriber purchases under a sales agreement with Spectrum (“Subscriber Purchased Devices”). Subscriber Property also includes any device that Spectrum conveys to Spectrum, either for a fee or at no cost (“Conveyed Devices”). Spectrum has no responsibility for the operation, support, maintenance, or repair of any Subscriber Purchased Devices or Conveyed Devices, including Subscriber Purchased or Conveyed Devices to which Spectrum or any third party provides software or downloads. Subscriber acknowledges and agrees that it is solely responsible for all content accessed through Subscriber Purchased Devices and Conveyed Devices, and that Spectrum has no liability for content available through Subscriber Purchased Devices or Conveyed Devices that Subscriber considers offensive, indecent or objectionable. Subscriber further acknowledges and agrees that Subscriber’s access or use of the content and services available from third-party providers for use on or through Subscriber Purchased Devices or Conveyed Devices may be subject to their own terms of service and policies, including privacy and data gathering policies, which Subscriber may be required to separately accept and acknowledge and with respect to which Spectrum disclaims and shall have no obligation or responsibility. Subscriber

is solely obligated to abide by such third-party terms and policies when and as they become applicable.

SUBSCRIBER PURCHASED DEVICES AND CONVEYED DEVICES ARE PROVIDED “AS IS”. SPECTRUM HEREBY DISCLAIMS ANY AND ALL CLAIMS ARISING FROM OR ASSOCIATED WITH THE FAILURE, OPERABILITY, PERFORMANCE, DEFECTS OR DAMAGES ARISING FROM SUBSCRIBER PURCHASED DEVICES OR CONVEYED DEVICES, ANY OF WHICH SHALL REMAIN MATTERS EXCLUSIVELY BETWEEN THE SUBSCRIBER AND THE MANUFACTURER OF SUCH DEVICES.

Spectrum is not responsible or liable for any loss or impairment of Spectrum's Service due in whole or in part to a malfunction, defect or otherwise caused by Subscriber Purchased Devices, Conveyed Devices, or Subscriber-provided equipment/software.

Notwithstanding anything to the contrary, Subscriber agrees to allow Spectrum and our agents the right (a) to install hardware in, (b) send software downloads to, and (c) install, access configure, maintain, inspect or upgrade Subscriber Purchased Devices or Conveyed Devices the extent necessary to provide the Services. Subscriber warrants that Subscriber is either the owner of such equipment or that Subscriber has the authority to give Spectrum access to it.

11. Taxes/Fees: Subscriber agrees to pay any local, state or federal taxes and fees imposed or levied on or with respect to the Services, the Equipment, Wiring, Subscriber Purchased Devices, Conveyed Devices, or installation or service charge incurred with respect to the same (including franchise fees). Without limitation, Spectrum shall be entitled to any sales fee or tax refund attributable to Subscriber Purchased Devices, for which Spectrum has paid applicable fees or taxes (or portion thereof) on behalf of Subscriber but with respect to which Subscriber has defaulted on its obligation to pay the full purchase price (whether under any sales installment plan or otherwise).

With respect to fees and taxes, including franchise fees, imposed by applicable government and regulatory authorities, Spectrum will review the amount it collects in such fees and taxes on a quarterly and annual basis. In the event Spectrum determines that it has collected any fees and/or taxes in excess of sums due to governmental and regulatory authorities, Spectrum will begin refunding such excess fees and taxes to current subscribers within 15 months of the end of each calendar year. Please be aware that, by law in some cases, Subscriber may be billed for taxes and fees that relate to time periods before Subscriber began receiving Services.

However, by law, Spectrum will not bill Subscriber for these fees more than 4 years after the year they were incurred by Spectrum. Franchise fees resulting from an audit by the applicable franchising authority are incurred at the time those fees are assessed.

12. Care of Spectrum Property and Service: Subscriber agrees that neither Subscriber nor any other person (except Spectrum's authorized personnel) will: (a) open, tamper with, service, or make any alterations to the Equipment or Wiring; nor (b) remove or relocate any Equipment or Wiring from the service address of initial installation. Any alteration, tampering, removal, or the use of Equipment or Wiring which permits the receipt of Services without authorization or the receipt of Services to an unauthorized number of outlets, or to unauthorized locations, constitutes theft of Service and is prohibited. Notwithstanding the foregoing, upon receipt of a request by Subscriber, Spectrum shall relocate the Equipment for Subscriber within Subscriber's home at a time mutually agreed to by Spectrum and Subscriber. Subscriber may incur a charge for such relocation and should consult a current Spectrum schedule of rates and charges prior to requesting such relocation. If the Subscriber moves residences outside of Spectrum's service area, Subscriber shall notify Spectrum that these Terms of Service shall be terminated and the provisions of Section 16 shall apply to such termination.

13. Access to Subscriber Premises: Subscriber authorizes Spectrum and its employees, agents, contractors and representatives to access and otherwise enter the Subscriber's premises to install, inspect, maintain and/or repair the Equipment o Wiring and, upon the termination of Service, to remove the Equipment from the premises. Spectrum's failure to remove its Equipment shall not be deemed abandonment thereof. If the installation and maintenance of Service are requested at premises that, in Spectrum's sole discretion, are or may become hazardous or dangerous to our employees, the public or property, Spectrum may refuse to install and maintain such Service.

14. Acknowledgments and Consent Regarding Recording of Communications and Contact Rights:

a. Recording of Communications. Subscriber acknowledges and agrees that all communications between Subscriber and Spectrum may be recorded or monitored by Spectrum for quality assurance or other purposes subject to applicable law.

b. Consent to Phone Calls and other Means of Communication. Subscriber agrees that Spectrum (or persons acting on Spectrum’s behalf) may use an automated

dialing system and/or prerecorded voice to call, text or e-mail any landline or wireless phone number or e-mail address that Subscriber provides to Spectrum for any non-promotional account, informational, or Service-related purpose such as, without limitation, collections and billing, appointment scheduling or confirmations, service alerts, security or network issues, or fraud violations. Subject to any limitations under applicable law, Subscriber may not opt-out of or revoke its consent to receive such communications, although you can manage your communication preferences by logging onto your account at www.spectrum.net.

c. Other Notices. Subscriber authorizes Spectrum to provide other notices using any method Spectrum determines appropriate, including by electronic means (for example, email or online posting).

d. Other Consents. Spectrum may ask you to provide other consents or authorizations, including by electronic means, email or your equipment (for instance, using your remote control to purchase a VOD movie, to request information regarding an advertiser's products or to "opt in" to a consumer study), and Spectrum is entitled to assume that any consent or authorization Spectrum receives through the Services or from your location has been authorized by you.

e. Email Address for Notice. Upon Spectrum's request, Subscriber will provide Spectrum with a current email address that Subscriber regularly checks so that Spectrum may provide notices and communications to Subscriber at that address. Spectrum's right to contact Subscriber as described in this Section survives the termination of these Terms of Service.

15. Secure Connection Requirements. Without abrogating or otherwise limiting Subscriber's separate obligations to secure Subscriber's account and equipment under these Terms of Service, Spectrum shall have the right to implement reasonable measures necessary to track, manage, and/or ensure the security and integrity of its network facilities, the video, phone, and/or Internet signals Spectrum transmits or receives, and the connection between any device or application used by Subscriber, members of Subscriber's household, Subscriber's guests, or any third parties and Spectrum's Equipment, system, or other network facilities (whether by physical, WiFi, wireless, software, or other means of connection), including without limitation authentication, access security, or other processes and means.

Without limiting any other rights Spectrum may have under the Terms of Service, Spectrum shall have the right to suspend, freeze, or otherwise cease Service or network access in the event and to the extent necessary to address any network

integrity or security concern that may arise with regard to activity on or through, conditions arising from or caused by the use, availability of, or access enabled at or through Subscriber's Service, Service location, equipment, or account.

16. Assignment or Transfer: These Terms of Service and the Services and/or Equipment supplied by Spectrum are not assignable or otherwise transferable by Subscriber, without specific written authorization from Spectrum.

17. Termination and Expiration:

a. Termination by Subscriber: Unless otherwise terminated, these Terms of Service shall automatically renew on a month-to-month basis. Subscriber acknowledges that upon such renewal all pricing is subject to change in accordance with these Terms of Service and to the extent permitted under applicable law. To terminate any recurring Service, Subscribers must call 855-757-7328, or provide a hardcopy written notice of termination to Spectrum delivered to 2 Digital Place, Floor 4, Simpsonville, SC 29681, and in any event, any such Subscriber-requested termination shall not be effective before the date Spectrum receives such request. Prior to effecting such termination or any other change to the account we will verify and authenticate your identity, confirm that you are authorized to request such changes, and confirm your election of such changes.

b. Termination for Bankruptcy: Spectrum shall have the right to terminate these Ter of Service immediately in the event that Subscriber makes an assignment for the benefit of creditors, or a voluntary or involuntary petition is filed by or against Subscriber under any law having for its purpose the adjudication of Subscriber as a bankrupt or the reorganization of Subscriber.

c. Termination for Breach: In the event of any breach of these Terms of Service by Subscriber, the failure of Subscriber to abide by the rates, rules and regulations of Spectrum, the failure of Subscriber to provide and maintain accurate registration information, or any illegal activity by the Subscriber using any Service, these Terms of Service may, at Spectrum's option, be terminated and the Equipment removed. Failure of Spectrum to remove such Equipment shall not be deemed abandonment thereof. Subscriber shall pay reasonable collection and/or attorney's fees to Spectrum in the event that Spectrum shall, in its discretion, find it necessary to enforce collection or to preserve and protect its rights under these Terms of Service. Spectrum may terminate these Terms of Service or Spectrum may reject an application or block access to or use of any component of any Service for any reason including, but not limited to, if:

i. Subscriber violates these Terms of Service as solely determined by Spectrum;
ii. The information required in the application process is or becomes incorrect, absent or incomplete;
iii. Subscriber threatened or harassed any Spectrum employee, agent, contractor or representative (e.g., by abusive language, physical threats, etc.);
iv. Subscriber's Payment Method fails to compensate Spectrum; or
v. The amount of technical support required to be provided to Subscriber is excessive as determined in the sole discretion of Spectrum.
vi. Subscriber further agrees that in the event of termination pursuant to subsections (b) or (c), Spectrum shall have no liability to Subscriber.

d. Obligations Upon Termination: Subscriber agrees that upon termination of these Terms of Service:
i. Subscriber will pay Spectrum in full for Services and Equipment through the end of the then-current monthly subscription service period.
ii. Subscriber will promptly return all Equipment to Spectrum. In the event that Subscriber fails to return any Equipment within ten (10) days of termination Subscriber shall be liable to Spectrum in accordance with Spectrum's then current schedule of charges for non-returned Equipment.

e. Renewal after Cancellation or Termination: Subscriber acknowledges and agree that in the event of renewal after cancellation or termination of a Service, Subscribe shall be subject to the pricing, warranties, and Terms of Service as are effective at time of such renewal.

18. Spectrum's Right to Pursue Remedies and Subscriber's Indemnification Obligations. If Subscriber breaches these Terms of Service, Spectrum has the right to seek compensation from Subscriber for such breach through arbitration or, if Subscriber has opted out of these Terms of Service' arbitration provision or we are seeking an order requiring you to do or refrain from doing something, in court. Additionally, if any person or entity brings a claim against Spectrum that arises out of Subscriber's relationship with Spectrum, the Services provided to Subscriber, the Terms of Service, or Subscriber's breach thereof or failure to comply therewith, Subscriber will indemnify, defend (at Spectrum's exclusive election), and release Spectrum from and against liability and reimburse Spectrum for any losses that Spectrum may incur, including reasonable attorneys' fees and costs, resulting from such claim. Subscriber's responsibilities under this Section cover any dispute, whether arising under contract, tort (for example, a negligence or product liability claim), violation of law or regulation or any other legal theory.

19. Security Deposit: Any security deposit required of Subscriber for the Equipment or Spectrum's Service will be due and payable upon the first monthly billing statement. Such security deposits will be returned to Subscriber within sixty (60) days of termination of Spectrum's Service so long as payment has been made for all amounts

Spectrum

Check availability

circumstances including without limitation when specific Service offer conditions require it, Subscribers are unable or unwilling to provide information to establish credit worthiness or have an unsatisfactory credit rating. The advance payment will be equal to the applicable installation charge and one month of recurring charges, excluding taxes, fees and surcharges. The advance payment will appear as a credit and be applied to the first monthly bill. Spectrum reserves the right to refuse Service if the Subscriber fails to fulfill standard credit requirements. After Service has been established, the Subscriber will be responsible for the payment of all applicable charges, including taxes, fees and surcharges to avoid discontinuance of Service.

21. Content and Services: All Services are subject to change in accordance with applicable law and these Terms of Service.

22. Rates: All rates are subject to change to the extent permitted under applicable la and these Terms of Service.

23. Late Fee: If Subscriber's account is past due, and payment has not been receive by the due date on the billing statement, Subscriber may be charged an applicable late fee in addition to Subscriber's past due balance at Spectrum's then current rate. If Subscriber's account thereafter remains unpaid, Subscriber's Services may be suspended or disconnected. Subscriber can avoid incurring late fees by paying Subscriber's monthly bill by the due date on the billing statement. Any late fees assessed are not considered interest credit service charges, finance charges or penalties.

24. Disclaimer: Spectrum assumes no liability for any program, services, content or information distributed on or through the Services and Spectrum expressly disclaims any responsibility or liability for Subscriber's use thereof. Further, Spectrum shall not be responsible for any products, merchandise or prizes promoted or purchased through the use of the Services.

25. Right to Make Credit Inquiries: Subscriber authorizes Spectrum to make inquiries and to receive information about Subscriber's credit experiences, including Subscriber's credit report, from others, to enter this information in Subscriber's file, and to disclose this information concerning Subscriber to appropriate third parties for reasonable business purposes.

26. Spectrum's Reservation of Rights: Spectrum reserves the right to refuse, suspend or terminate Service to any person at any time for any reason not prohibited by law. When practical, Spectrum will provide notice that is reasonable under the circumstances before suspending or terminating Service to an existing Subscriber, and Spectrum will provide any prior notice of suspension or termination that is required by law.

27. Indemnification: Subscriber agrees to defend, indemnify, and hold Spectrum, including its officers, directors, employees, affiliates, subsidiaries, and authorized agents (individually and collectively, "Spectrum Indemnitees") harmless from and against any and all demands, claims, suits, judgments, expenses (including without limitation reasonable attorney or witness fees), loss, damages to, or destruction of personal, real, or intellectual property, bodily injury or death of any person, and other liabilities arising from:

a. The installation, operation, provision, or other use of Spectrum Services and/or Equipment;

b. Any violation of Spectrum's Terms of Service, Acceptable Use Policy, or other published policies or requirements;

c. The negligence, willful misconduct, violation of a third party's rights, or failure to comply with applicable law by (i) Subscriber, (ii) members of Subscriber's household, or (iii) Subscriber's guests, or (iv) any other person using the Services provided to Subscriber;

d. Libel or slander resulting from any use of the Services by (i) Subscriber, (ii) members of Subscriber's household, (iii) Subscriber's guests, or (iv) any other person using the Services provided to Subscriber;

e. Infringement or misappropriation of any patent, copyright, trademark, trade name, service mark, trade secret, or other intellectual property rights (whether by transmission or material or otherwise) by (i) Subscriber, (ii) members of Subscriber's household, (iii) Subscriber's guests, or (iv) any other person using the Services

provided to Subscriber, including that effected through combination of Subscriber's use of the respective Service(s) with facilities, equipment, or services provided or used by Subscriber or obtained from third parties;

f. unauthorized, unlawful, or fraudulent use of or access to the Services, except as otherwise provided by applicable law; and

g. Any infringement or invasion of the right of privacy of any person or persons, caused or claimed to have been caused, directly or indirectly, by the installation, operation, failure to operate, maintenance, removal, presence, condition, or use of the 911 or E-911 service features and the equipment associated therewith, or by the use of any Voice Services furnished by Spectrum in connection with the 911 or E-911 service, including but not limited to, the telephone number, address or name associated with the telephone used by persons accessing 911 or E-911 service thereunder, and/or that which arises out of the negligence or other wrongful act of (i) Subscriber,(ii) members of Subscriber's household, (iii) Subscriber's guests, or (ii) any other person using the Services provided to Subscriber.

h. The foregoing defense and indemnity obligations exclude damages to the extent caused by the gross negligence or willful misconduct of the Spectrum Indemnitees. Subscriber agrees that Spectrum Indemnitees are not liable for any damages or liability resulting from the loss of Services (whether Internet, Cable, Voice, or other Services), nor will Subscriber make any claims or undertake any actions against Spectrum Indemnitees for loss of Service. Subscriber shall be solely responsible for any damage to or loss of Spectrum Equipment, unless such damage or loss is caus solely by the negligence or willful misconduct of Spectrum Indemnitees.

28. Limitation of Liability.

a. THE LIMITATION OF LIABILITY SET FORTH IN THIS SECTION APPLY TO ANY ACTS, OMISSIONS AND NEGLIGENCE OF SPECTRUM AND ITS THIRD PARTY SERVICE PROVIDERS, AGENTS AND SUPPLIERS (AND EACH OF THEIR RESPECTIVE OFFICERS, EMPLOYEES, AGENTS, CONTRACTORS OR REPRESENTATIVES).

b. One Year Limitation Period. EXCEPT AS OTHERWISE REQUIRED UNDER APPLICABLE LAW, ANY CLAIM YOU MAY HAVE AGAINST SPECTRUM MUST BE COMMENCED WITHIN ONE (1) YEAR AFTER THE CLAIM ARISES. IF SUBSCRIBER DOES NOT BRING A CLAIM WITHIN THIS PERIOD, SUBSCRIBER IS BARRED FROM BRINGING SUCH CLAIM, AND SPECTRUM WILL HAVE NO LIABILITY WITH RESPECT TO SUCH CLAIM.

c. Damages. TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, UNDER NO CIRCUMSTANCES SHALL SPECTRUM BE LIABLE TO CUSTOMER FOR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR EXEMPLARY DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE SERVICE OR ANY ACTS OR OMISSIONS ASSOCIATED THEREWITH, INCLUDING ANY ACTS OR OMISSIONS BY THIRD PARTY SERVICE PROVIDERS OR ANY MANUFACTURER OF OR SUBSCRIBER PURCHASED DEVICES OR CONVEYED DEVICES, AGENTS OR SUBCONTRACTORS OF SPECTRUM, OR RELATING TO ANY SERVICES FURNISHED, WHETHER SUCH CLAIM IS BASED ON BREACH OF WARRANTY, CONTRACT, TORT OR ANY OTHER LEGAL THEORY, AND REGARDLESS OF THE CAUSES OF SUCH LOSS OR DAMAGES OR WHETHER ANY OTHER REMEDY PROVIDED HEREIN FAILS. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, SPECTRUM'S ENTIRE LIABILITY AND CUSTOMER'S EXCLUSIVE REMEDY WITH RESPECT TO THE USE OF THE SERVICES OR ANY BREACH BY SPECTRUM OF ANY OBLIGATION SPECTRUM MAY HAVE UNDER THESE TERMS OF SERVICE OR APPLICABLE LAW, SHALL BE CUSTOMER'S ABILITY TO TERMINATE THE SERVICE OR TO OBTAIN THE REPLACEMENT OR REPAIR OF ANY DEFECTIVE EQUIPMENT PROVIDED BY SPECTRUM. IN NO EVENT SHALL SPECTRUM'S LIABILITY TO CUSTOMER FOR ANY CLAIM ARISING OUT OF THESE TERMS OF SERVICE EXCEED THE AMOUNT PAID BY CUSTOMER DURING THE PRECEDING THIRTY (30) DAY PERIOD. IN JURISDICTIONS THAT DO NOT PERMIT THE EXCLUSION OF CERTAIN WARRANTIES OR THE LIMITATION OR EXCLUSION OF CONSEQUENTIAL OR INCIDENTAL DAMAGES, SPECTRUM’S LIABILITY SHAL BE LIMITED TO THE MAXIMUM EXTENT PERMITTED BY LAW.

SUBSCRIBER ALSO AGREES THAT IT SHALL NOT BE PERMITTED TO BRING ANY CLAIM WHATSOEVER AGAINST SPECTRUM THAT RESULTS IN WHOLE OR IN PART FROM SUBSCRIBER'S FAILURE TO COMPLY WITH THESE TERMS OF SERVICE.

THIS SECTION SHALL SURVIVE THE TERMINATION OF THESE TERMS OF SERVICE.

29. Privacy Policy. Spectrum will provide Subscriber with a copy of its Privacy Policy at the time Spectrum provides Service to Subscriber, and annually afterwards, or as otherwise required by law. Subscriber can view the most current version of our Privacy Policy by going to www.spectrum.com/privacy. Subscriber assumes sole responsibility for all privacy, security and other risks associated with providing

personally identifiable information to third parties via the Service. To the extent that Spectrum is expressly required to do so by applicable law, Spectrum will provide notice to Subscriber of a breach of the security of certain personally identifiable information about Subscriber. Subscriber agrees that Spectrum may collect and disclose information concerning Subscriber and Subscriber's use of Service in the manner and for the purposes set forth herein and in Spectrum's Privacy Policy. In order to protect the privacy of Subscriber's account information, Spectrum may require that Subscriber use a security code or other method, in addition to the username and password, to confirm Subscriber's identity when requesting or otherwise accessing account information or making changes to Subscriber's Service through Spectrum's customer service representatives. Subscriber may also choose to designate an authorized user of Subscriber's account (an "Authorized User"), who will be able to access or modify Subscriber's account information and update and/or make Service changes. Once established, an Authorized User will be required to authenticate his/her identity in the same manner according to Spectrum's policies.

30. ARBITRATION. The following provisions are important with respect to the agreement between Subscriber and Spectrum regarding Spectrum's Services memorialized by these Terms of Service.

PLEASE READ THEM CAREFULLY TO ENSURE THAT SUBSCRIBER UNDERSTANDS EACH PROVISION. These Terms of Service require the use of arbitration to resolve disputes and otherwise limits the remedies available to Subscriber in the event of a dispute.

Spectrum and Subscriber agree to arbitrate disputes and claims arising out of or relating to these Terms of Service, the Services, the Equipment, or marketing of the Services Subscriber has received from Spectrum. Notwithstanding the foregoing, either party may bring an individual action on any matter or subject in small claims court.

THESE TERMS OF SERVICE MEMORIALIZE A TRANSACTION IN INTERSTATE COMMERCE. THE FEDERAL ARBITRATION ACT GOVERNS THE INTERPRETATION AND ENFORCEMENT OF THESE ARBITRATION PROVISIONS.

A party who intends to seek arbitration must first send to the other a written notice of intent to arbitrate, entitled "Notice of Intent to Arbitrate" ("Notice"). The Notice to Spectrum should be addressed to: VP and Associate General Counsel, Litigation, Charter Communications, 12405 Powerscourt Drive, St. Louis, MO 63131 ("Arbitration Notice Address"). The Notice must: (1) describe the nature and basis of the claim or

dispute; and (ii) set forth the specific relief sought. If we do not reach an agreement to resolve the claim within 30 days after the Notice is received, Subscriber or Spectrum may commence an arbitration proceeding under these Terms of Service.

The arbitration shall be governed by the Consumer Arbitration Rules (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by these Terms of Service, and the arbitration shall be administered by the AAA. The AAA Rules and fee information are available at "www.adr.org," by calling the AAA at 1-800-778-7879, or by writing to the Arbitration Notice Address.

The arbitrator shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, scope, or enforceability of these arbitration provisions and these Terms of Service.

SPECTRUM SHALL BEAR THE COST OF ANY ARBITRATION FILING FEES AND ARBITRATOR'S FEES REQUIRED BY THE AAA RULES OR OTHERWISE TO THE EXTENT REQUIRED UNDER APPLICABLE LAW TO RENDER THESE ARBITRATION PROVISIONS ENFORCEABLE.

If the arbitrator's award exceeds $75,000, either party may appeal such award to a three-arbitrator panel administered by the AAA and selected according to the AAA Rules, by filing a written notice of appeal within 30 days after the date of entry of the arbitration award. The appealing party must provide the other party with a copy of such appeal concurrently with its submission of the appeals notice to AAA. The three arbitrator panel must issue its decision within 120 days of the date of the appealing party's notice of appeal. The decision of the three-arbitrator panel shall be final and binding, except for any appellate right which may exist under the Federal Arbitration Act.

The parties may agree that arbitration will be conducted solely on the basis of the documents submitted to the arbitrator, via a telephonic hearing, or by an in-person hearing as established by AAA rules.

SUBSCRIBER AGREES THAT, BY ENTERING INTO THIS AGREEMENT, SUBSCRIBER AND SPECTRUM ARE WAIVING THE RIGHT TO A TRIAL BY JUDGE OR JURY.

Unless Spectrum and Subscriber agree otherwise in writing, all hearings conducted as part of the arbitration shall take place in the county (or parish) of Subscriber's billing address.

To the fullest extent permitted under applicable law, the arbitrator may award injunctive relief only in favor of the party seeking relief, only to the extent sought, and only to the extent necessary to provide the specific relief warranted by such individual's claim.

The parties agree that the arbitrator must give effect to the terms of these Terms of Service.

SUBSCRIBER AND SPECTRUM AGREE THAT CLAIMS MAY ONLY BE BROUGHT IN A PARTY'S INDIVIDUAL CAPACITY AND NOT ON BEHALF OF, OR AS PART OF, A CLASS ACTION OR REPRESENTATIVE PROCEEDING

Furthermore, unless both Subscriber and Spectrum agree otherwise in writing, the arbitrator may not consolidate proceedings or more than one person's claims and may not otherwise preside over any form of representative or class proceeding. If this specific paragraph is found to be unenforceable, then the entirety of these arbitration provisions shall be null and void and rendered of no further effect with respect to the specific claim at issue.

Right to Opt Out. If Subscriber does not wish to be bound by these arbitration provisions, Subscriber must notify Spectrum in writing within 30 days of (a) the date that these arbitration provisions become effective, if Subscriber is an existing customer, or (b) the date that Subscriber first subscribes to the Service(s). Subscrib may opt out by mail to the Arbitration Notice Address. Subscriber's written notificatio to Spectrum must include Subscriber's name, address, and Spectrum account number as well as a clear statement that Subscriber does not wish to resolve disputes with Spectrum under these arbitration provisions. Subscriber's decision to opt out of this arbitration provision will have no adverse effect on Subscriber's relationship with Spectrum or the delivery of Services to Subscriber by Spectrum. For the avoidance of doubt, Subscriber's right to opt out from these arbitration provisions is prospective only and does not apply to previous periods. If Subscriber and Spectrum previously agreed to an arbitration agreement, an opt out from these arbitration provisions does not relieve either Subscriber or Spectrum from the obligation to arbitrate claims coming within the scope of that previous arbitration agreement.

Severability. If any clause within these arbitration provisions is found to be illegal or unenforceable, that specific clause will be severed from these arbitration provisions, and the remainder of the arbitration provisions will be given full force and effect.

NOTWITHSTANDING ANYTHING TO THE CONTRARY, IN THE EVENT SOME OR ALL OF THESE ARBITRATION PROVISIONS IS DETERMINED TO BE UNENFORCEABLE FOR ANY REASON, OR IF A CLAIM IS BROUGHT THAT IS EXCLUDED FROM THE SCOPE OF THESE ARBITRATION PROVISIONS (INCLUDING THOSE WITH RESPECT TO WHICH SUBSCRIBER HAS OPTED OUT OF THESE ARBITRATION PROVISIONS), BOTH PARTIES AGREE TO WAIVE, TO THE FULLEST PERMITTED UNDER APPLICABLE LAW, ANY TRIAL BY JURY AND ANY RIGHT TO PARTICIPATE IN CLASS ACTIONS.

For purposes of the foregoing sentence only, in the event such waiver or any part of it is found to be unenforceable, it shall be severed from these Terms of Service, rendered null and void and of no further effect without affecting the rest of the arbitration provisions set forth herein.

EXCLUSIONS. SUBSCRIBER AND SPECTRUM AGREE THAT THE FOLLOWING CLAIMS OR DISPUTES SHALL NOT BE SUBJECT TO ARBITRATION:

(1) ANY INDIVIDUAL ACTION BROUGHT BY SUBSCRIBER OR BY SPECTRUM ON ANY MATTER OR SUBJECT THAT IS WITHIN THE JURISDICTION OF A COURT THAT IS LIMITED TO ADJUDICATING SMALL CLAIMS.

(2) ANY DISPUTE OVER THE VALIDITY OF ANY PARTY'S INTELLECTUAL PROPERTY RIGHTS.

(3) ANY DISPUTE RELATED TO OR ARISING FROM ALLEGATIONS ASSOCIATEI WITH UNAUTHORIZED USE OR RECEIPT OF SERVICE.

For New York Video Subscribers. Subscriber may elect to resolve a dispute through the New York Public Service Commission in accordance with 16 NYCRR §890.709(a) and 16 NYCRR §709(c).

The foregoing arbitration provisions shall survive the termination of these Terms of Service.

Subscriber may opt out of this Section, in which case the normal statute of limitations will apply. To opt out, Subscriber must notify Spectrum in writing by sending a letter to Spectrum addressed to VP and Associate General Counsel, Litigation, Charter Communications, 12405 Powerscourt Drive, St. Louis, MO 63131, within 30 days of (a) the date that this provision becomes effective, if Subscriber is an existing customer, or (b) the date that Subscriber first subscribes to the Service(s).

Subscriber's written notice must include Subscriber's name, address, and Spectrum account number as well as a clear statement that Subscriber does not wish this Section to apply.

This Section shall survive the termination of these Terms of Service.

31. Force Majeure: Spectrum shall not be liable for any failure of performance or equipment of any kind (including Spectrum Equipment) due to causes beyond its control, including but not limited to: acts of God, fire, flood, or other catastrophes; loss of electrical power; any law, order, regulation, direction, action, or request of the United States Government, or of any other government, including state and local governments having or claiming jurisdiction over Spectrum, or of any department agency, commission, bureau, corporation, or other instrumentality of any one or more of these federal, state, or local governments, or of any civil or military authority; national emergencies; insurrection; riots, wars; unavailability of rights-of-way or materials; or strikes, lock-outs, work stoppages, or other labor difficulties.

32. Survival of Terms. In addition to the terms that are specifically noted in these Terms of Service as surviving termination of these Terms of Service, all representations, warranties, indemnifications, and limitations of liability shall survive these Terms of Service. Spectrum's right to contact Subscriber shall also survive these Terms of Service unless Subscriber opts out in the manner described in these Terms of Service. All other obligations of Subscriber and Spectrum under these Tern of Service also survive termination if they relate to the period before termination or, i by their terms, they would be expected to survive such termination.

**33. Entire Agreement: These Terms of Service (including the Terms of Service incorporated herein by reference) constitute the entire agreement between the Subscriber and Spectrum. No undertaking, representation or warranty made by an agent or representative of Spectrum in connection with the sale, installation, maintenance or removal of Spectrum's Services or Equipment shall be binding on Spectrum except as expressly included herein. Terms of Service. In the event that any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, and all other provisions shall remain in full force and effect. If any of the provisions of this Agreement are held to be excessively broad or invalid, illegal or unenforceable in any jurisdiction, it shall be reformed and**

**construed by limiting and reducing it so as to be enforceable to the maximum extent permitted by law in conformance with its original intent.**

**Neither the course of conduct between the parties nor trade practice shall act to modify any provision of the Terms of Service.**



Not all products, pricing, and services are available in all areas. Pricing and actual speeds may vary. Internet speeds based on wired connection. Restrictions apply.

©2024 Charter Communications. All rights reserved.

Chat With Us

# EXHIBIT J

PETITION # **749**

**VIA US MAIL**

VP and Associate General Counsel, Litigation
Charter Communications
12405 Powerscourt Drive
St. Louis, MO 63131

**RE: DEMAND FOR ARBITRATION AND OPT-OUT NOTICE**

**Client Address:** [redacted]

**Client Phone Number:** [redacted]

## PETITION

**Antonio Duenas**, ("Claimant"), through counsel, files this Petition against Charter Communications Inc. d/b/a/ Spectrum ("Spectrum") and, in support of this Petition, states the following. This demand seeks damages up to $10,000.00. Pursuant to the arbitration agreement, Claimant requests that Respondent pay all American Arbitration Association ("AAA") filing fees, administration fees, hearing fees, and/or other fees.

Pursuant to Claimant's rights under the arbitration agreement, Claimant hereby chooses that the arbitration will be conducted solely on documents submitted to the arbitrator; however, reserves the right to demand a telephonic hearing or in-person hearing.

## ARBITRATION JURISDICTION

The Spectrum Residential General Terms and Conditions of Service Agreement ("Agreement" and Exhibit A) contains an arbitration provision that requires disputes to be administered by the AAA. The AAA Rules require Claimant to serve Spectrum and Claimant has served a copy of this Petition at the address listed above. As this condition has been met, Claimant brings this arbitration.

## INTRODUCTION AND GENERAL ALLEGATIONS

While Spectrum advertises certain prices for their monthly cable plans, Spectrum then adds unexpected hidden charges including the "Broadcast TV Surcharge" (hereinafter referred to as the "BTS"). Since the inception of the BTS in 2010 of $1.00 per month, the BTS has increased to $25.75 per month beginning January 30, 2024 – a 2575% increase in 14 years. That amounts to a $309.00 increase to each customer annually. The cost to access local broadcast television has not increased by nearly 26x in the last 14 years and, in fact, access is free outside of using a cable plan.

Spectrum's advertising does not contemplate the inclusion of the BTS. Any customer looking to purchase a Spectrum plan would see a monthly advertised price and understandably conclude that it included all of the channels that the plan purports to include in the monthly price:




*See also* Exhibit B. Exhibit B is direct advertising from Spectrum's website that includes all of Spectrum's monthly plans without any mention of the BTS - even by reference in a footnote. Neither the Agreement nor Spectrum's advertising disclosures incorporate, by reference or otherwise, a fee schedule or proper disclosure of the BTS to include how much is charged, when it's charged, and that Spectrum retains the right to unilaterally change the amount of the BTS.

Only when someone becomes aware of the BTS and actively searches for an explanation of the BTS, do they discover any disclosure. Such disclosure, by way of example, only assists Spectrum in accomplishing their scheme. *See* Exhibit C. Spectrum describes the BTS as a pass-through fee requiring Spectrum to charge the BTS to its customers. And Spectrum imposes the BTS upon each customer whether they watch broadcast TV or not. *Ibid.* The disclosure further provides an unfair and deceptive explanation as to why the customer is being charged the BTS and expressly fails to tell the customers that, absent using a Spectrum account, the customer can access broadcast television free of charge. In actuality, the BTS was concocted by Spectrum as an unlawful mechanism to increase their revenue.

Spectrum should have accurately stated the true monthly prices for its cable plans in its price representations and advertising. Spectrum failed to do so. Spectrum's BTS scheme has enabled, and continues to enable, Spectrum to effectively increase its rates without having to publicly announce those higher rates.

**<u>COUNT 1 - California Consumers Legal Remedies Act §§ 1750 et seq.</u>**

1. All of the foregoing allegations are restated as if fully set forth herein.
2. Claimant purchased a Spectrum cable plan for personal, family, or household purposes.

3. As described above and incorporated herein, Spectrum deceived its customers by advertising one price for its monthly cable plans and subsequently including the BTS that is nothing more than a revenue grab.
4. Spectrum failed to disclose the existence of the BTS in its advertising and its Agreement and further failed to properly disclose the BTS on its website by disclosing the BTS to deceive its customers into believing that the fee is a pass-through mandated fee.
5. Spectrum has violated California Consumers Legal Remedies Act §§ 1750 et seq. by acting unfairly and/or deceptively in its dealings with Claimant.
6. Claimant has suffered ascertainable financial damages by the unfair and deceptive trade practices of Spectrum.

## PRAYER FOR RELIEF

WHEREFORE, Claimant requests the relief as specified herein:

- For an order awarding Claimant compensatory damages and statutory damages, including punitive damages, and all other sums of money owed, together with interest on these amounts;
- For preliminary, permanent, and mandatory injunctive relief prohibiting Respondent and its affiliates from charging its customers the BTS in the future;
- For pre- and post-judgment interest;
- For an award of reasonable attorneys' fees and costs as provided by the Agreement and/or other applicable law state or federal law;
- For all costs of suit; and
- For such other and further relief as the Arbitrator deems just and proper.

Respectfully Submitted,

By: /s/ *Evan Murphy*
Murphy Advocates LLC
Evan Murphy, Co. Bar No. 33563
1600 Broadway, Suite 1600
Denver, CO 80202
(314) 753-5212
evan@murphyadvocates.com

/s/ Maurice Mitts
Mitts Law LLC
Maurice Mitts, PA Bar No. 50297
1822 Spruce Street
Philadelphia, PA 19103
(215) 866-0110
mmitts@mittslaw.com
215-866-0110

*Attorneys for Claimants*

# EXHIBIT K

PETITION # **420**

**VIA US MAIL**

VP and Associate General Counsel, Litigation
Charter Communications
12405 Powerscourt Drive
St. Louis, MO 63131

**RE: DEMAND FOR ARBITRATION AND OPT-OUT NOTICE**

**Client Address:** [redacted]

**Client Phone Number:** [redacted]

**PETITION**

**Andrew Epstein**, ("Claimant"), through counsel, files this Petition against Charter Communications Inc. d/b/a/ Spectrum ("Spectrum") and, in support of this Petition, states the following. This demand seeks damages up to $10,000.00. Pursuant to the arbitration agreement, Claimant requests that Respondent pay all American Arbitration Association ("AAA") filing fees, administration fees, hearing fees, and/or other fees.

Pursuant to Claimant's rights under the arbitration agreement, Claimant hereby chooses that the arbitration will be conducted solely on documents submitted to the arbitrator; however, reserves the right to demand a telephonic hearing or in-person hearing.

**ARBITRATION JURISDICTION**

The Spectrum Residential General Terms and Conditions of Service Agreement ("Agreement" and Exhibit A) contains an arbitration provision that requires disputes to be administered by the AAA. The AAA Rules require Claimant to serve Spectrum and Claimant has served a copy of this Petition at the address listed above. As this condition has been met, Claimant brings this arbitration.

**INTRODUCTION AND GENERAL ALLEGATIONS**

While Spectrum advertises certain prices for their monthly cable plans, Spectrum then adds unexpected hidden charges including the "Broadcast TV Surcharge" (hereinafter referred to as the "BTS"). Since the inception of the BTS in 2010 of $1.00 per month, the BTS has increased to $25.75 per month beginning January 30, 2024 – a 2575% increase in 14 years. That amounts to a $309.00 increase to each customer annually. The cost to access local broadcast television has not increased by nearly 26x in the last 14 years and, in fact, access is free outside of using a cable plan.

Spectrum's advertising does not contemplate the inclusion of the BTS. Any customer looking to purchase a Spectrum plan would see a monthly advertised price and understandably conclude that it included all of the channels that the plan purports to include in the monthly price:




*See also* Exhibit B. Exhibit B is direct advertising from Spectrum's website that includes all of Spectrum's monthly plans without any mention of the BTS - even by reference in a footnote. Neither the Agreement nor Spectrum's advertising disclosures incorporate, by reference or otherwise, a fee schedule or proper disclosure of the BTS to include how much is charged, when it's charged, and that Spectrum retains the right to unilaterally change the amount of the BTS.

Only when someone becomes aware of the BTS and actively searches for an explanation of the BTS, do they discover any disclosure. Such disclosure, by way of example, only assists Spectrum in accomplishing their scheme. *See* Exhibit C. Spectrum describes the BTS as a pass-through fee requiring Spectrum to charge the BTS to its customers. And Spectrum imposes the BTS upon each customer whether they watch broadcast TV or not. *Ibid.* The disclosure further provides an unfair and deceptive explanation as to why the customer is being charged the BTS and expressly fails to tell the customers that, absent using a Spectrum account, the customer can access broadcast television free of charge. In actuality, the BTS was concocted by Spectrum as an unlawful mechanism to increase their revenue.

Spectrum should have accurately stated the true monthly prices for its cable plans in its price representations and advertising. Spectrum failed to do so. Spectrum's BTS scheme has enabled, and continues to enable, Spectrum to effectively increase its rates without having to publicly announce those higher rates.

**<u>COUNT 1 - California Consumers Legal Remedies Act §§ 1750 et seq.</u>**

1. All of the foregoing allegations are restated as if fully set forth herein.
2. Claimant purchased a Spectrum cable plan for personal, family, or household purposes.

3. As described above and incorporated herein, Spectrum deceived its customers by advertising one price for its monthly cable plans and subsequently including the BTS that is nothing more than a revenue grab.
4. Spectrum failed to disclose the existence of the BTS in its advertising and its Agreement and further failed to properly disclose the BTS on its website by disclosing the BTS to deceive its customers into believing that the fee is a pass-through mandated fee.
5. Spectrum has violated California Consumers Legal Remedies Act §§ 1750 et seq. by acting unfairly and/or deceptively in its dealings with Claimant.
6. Claimant has suffered ascertainable financial damages by the unfair and deceptive trade practices of Spectrum.

**PRAYER FOR RELIEF**

WHEREFORE, Claimant requests the relief as specified herein:

- For an order awarding Claimant compensatory damages and statutory damages, including punitive damages, and all other sums of money owed, together with interest on these amounts;
- For preliminary, permanent, and mandatory injunctive relief prohibiting Respondent and its affiliates from charging its customers the BTS in the future;
- For pre- and post-judgment interest;
- For an award of reasonable attorneys' fees and costs as provided by the Agreement and/or other applicable law state or federal law;
- For all costs of suit; and
- For such other and further relief as the Arbitrator deems just and proper.

Respectfully Submitted,

By: /s/ *Evan Murphy*
Murphy Advocates LLC
Evan Murphy, Co. Bar No. 33563
1600 Broadway, Suite 1600
Denver, CO 80202
(314) 753-5212
evan@murphyadvocates.com

/s/ Maurice Mitts
Mitts Law LLC
Maurice Mitts, PA Bar No. 50297
1822 Spruce Street
Philadelphia, PA 19103
(215) 866-0110
mmitts@mittslaw.com
215-866-0110

*Attorneys for Claimants*

# EXHIBIT L

PETITION # **188**

**VIA US MAIL**

VP and Associate General Counsel, Litigation
Charter Communications
12405 Powerscourt Drive
St. Louis, MO 63131

**RE: DEMAND FOR ARBITRATION AND OPT-OUT NOTICE**

**Client Address:** [redacted]

**Client Phone Number:** [redacted]

**PETITION**

**Alfred Holguin**, ("Claimant"), through counsel, files this Petition against Charter Communications Inc. d/b/a/ Spectrum ("Spectrum") and, in support of this Petition, states the following. This demand seeks damages up to $10,000.00. Pursuant to the arbitration agreement, Claimant requests that Respondent pay all American Arbitration Association ("AAA") filing fees, administration fees, hearing fees, and/or other fees.

Pursuant to Claimant's rights under the arbitration agreement, Claimant hereby chooses that the arbitration will be conducted solely on documents submitted to the arbitrator; however, reserves the right to demand a telephonic hearing or in-person hearing.

**ARBITRATION JURISDICTION**

The Spectrum Residential General Terms and Conditions of Service Agreement ("Agreement" and Exhibit A) contains an arbitration provision that requires disputes to be administered by the AAA. The AAA Rules require Claimant to serve Spectrum and Claimant has served a copy of this Petition at the address listed above. As this condition has been met, Claimant brings this arbitration.

**INTRODUCTION AND GENERAL ALLEGATIONS**

While Spectrum advertises certain prices for their monthly cable plans, Spectrum then adds unexpected hidden charges including the "Broadcast TV Surcharge" (hereinafter referred to as the "BTS"). Since the inception of the BTS in 2010 of $1.00 per month, the BTS has increased to $25.75 per month beginning January 30, 2024 – a 2575% increase in 14 years. That amounts to a $309.00 increase to each customer annually. The cost to access local broadcast television has not increased by nearly 26x in the last 14 years and, in fact, access is free outside of using a cable plan.

Spectrum's advertising does not contemplate the inclusion of the BTS. Any customer looking to purchase a Spectrum plan would see a monthly advertised price and understandably conclude that it included all of the channels that the plan purports to include in the monthly price:




*See also* Exhibit B. Exhibit B is direct advertising from Spectrum's website that includes all of Spectrum's monthly plans without any mention of the BTS - even by reference in a footnote. Neither the Agreement nor Spectrum's advertising disclosures incorporate, by reference or otherwise, a fee schedule or proper disclosure of the BTS to include how much is charged, when it's charged, and that Spectrum retains the right to unilaterally change the amount of the BTS.

Only when someone becomes aware of the BTS and actively searches for an explanation of the BTS, do they discover any disclosure. Such disclosure, by way of example, only assists Spectrum in accomplishing their scheme. *See* Exhibit C. Spectrum describes the BTS as a pass-through fee requiring Spectrum to charge the BTS to its customers. And Spectrum imposes the BTS upon each customer whether they watch broadcast TV or not. *Ibid.* The disclosure further provides an unfair and deceptive explanation as to why the customer is being charged the BTS and expressly fails to tell the customers that, absent using a Spectrum account, the customer can access broadcast television free of charge. In actuality, the BTS was concocted by Spectrum as an unlawful mechanism to increase their revenue.

Spectrum should have accurately stated the true monthly prices for its cable plans in its price representations and advertising. Spectrum failed to do so. Spectrum's BTS scheme has enabled, and continues to enable, Spectrum to effectively increase its rates without having to publicly announce those higher rates.

## <u>COUNT 1 - California Consumers Legal Remedies Act §§ 1750 et seq.</u>

1. All of the foregoing allegations are restated as if fully set forth herein.
2. Claimant purchased a Spectrum cable plan for personal, family, or household purposes.

3. As described above and incorporated herein, Spectrum deceived its customers by advertising one price for its monthly cable plans and subsequently including the BTS that is nothing more than a revenue grab.
4. Spectrum failed to disclose the existence of the BTS in its advertising and its Agreement and further failed to properly disclose the BTS on its website by disclosing the BTS to deceive its customers into believing that the fee is a pass-through mandated fee.
5. Spectrum has violated California Consumers Legal Remedies Act §§ 1750 et seq. by acting unfairly and/or deceptively in its dealings with Claimant.
6. Claimant has suffered ascertainable financial damages by the unfair and deceptive trade practices of Spectrum.

**PRAYER FOR RELIEF**

WHEREFORE, Claimant requests the relief as specified herein:

- For an order awarding Claimant compensatory damages and statutory damages, including punitive damages, and all other sums of money owed, together with interest on these amounts;
- For preliminary, permanent, and mandatory injunctive relief prohibiting Respondent and its affiliates from charging its customers the BTS in the future;
- For pre- and post-judgment interest;
- For an award of reasonable attorneys' fees and costs as provided by the Agreement and/or other applicable law state or federal law;
- For all costs of suit; and
- For such other and further relief as the Arbitrator deems just and proper.

Respectfully Submitted,

By: /s/ *Evan Murphy*
Murphy Advocates LLC
Evan Murphy, Co. Bar No. 33563
1600 Broadway, Suite 1600
Denver, CO 80202
(314) 753-5212
evan@murphyadvocates.com

/s/ Maurice Mitts
Mitts Law LLC
Maurice Mitts, PA Bar No. 50297
1822 Spruce Street
Philadelphia, PA 19103
(215) 866-0110
mmitts@mittslaw.com
215-866-0110

*Attorneys for Claimants*

# EXHIBIT M

**IN THE AMERICAN ARBITRATION ASSOCIATION**

INDIVIDUAL CLAIMANTS

vs.

CHARTER COMMUNICATIONS LLC d/b/a SPECTRUM

AAA Multiple Case No. 01-24-0009-0630

**ORDER & OPINION OF PROCESS ARBITRATOR, JUDGE DENNIS CAVANAUGH, RET. RE: ISSUES RAISED IN PROCESS ARBITRATION**

The underlying matter is a Mass Arbitration administered by the American Arbitration Association ("AAA" or "Association"). The undersigned has been designated as the Process Arbitrator and has been charged with making decisions regarding certain issues which have arisen between the parties as to the manner in which the underlying Arbitration should proceed. This Order and Opinion sets forth the Process Arbitrator's determination as to those issues.

For the reasons to be set forth more fully herein, the Process Arbitrator finds that the Individual Claimants' cases should be closed and that the parties proceed in small claims court.

## I. Factual and Procedural Background

This matter arises from more than 15,000 demands for individual consumer arbitrations initially filed against Charter Communications LLC d/b/a Spectrum.[1] Each demand alleges that Spectrum adds unexpected, hidden charges to its monthly cable and internet bills. Spectrum has requested the appointment of a process arbitrator to address filing and

[1] For simplicity's sake, Respondent will be referred to as "Spectrum" (Charter's brand name) or "Respondent" throughout this Order and Opinion.

jurisdictional deficiencies “warranting the closure of most, if not all, of the cases and the refiling of a few that may survive”.

On March 31, 2025, an initial conference was held in this matter. In advance of the conference, the Process Arbitrator was provided with a list of eight issues raised by Spectrum which the parties had initially disputed. As a consequence of the conference, the parties were also directed to meet and confer in an effort to resolve as many issues as possible and then to file written submissions as to their positions regarding any unresolved disputes. The parties then submitted their respective briefings. Those briefings confirmed that three of the eight initial issues had been resolved. Additionally, one other issue – Spectrum’s assertion that Claimants failed to provide required pre-arbitration notice – has now been mooted since Respondent is no longer seeking affirmative relief on that basis.

In simplified form, those remaining contested issues are:

1. The applicability of a small claims court exclusion contained in Spectrum’s Arbitration clause;
2. Spectrum’s statute of limitations defenses; and
3. Certain “procedural determinations” such as (a) the format of arbitrations; and (b) the selection of merits arbitrators.

Claimants and Respondent have provided both opening briefs and reply briefs. What follows comprises a summary of the pertinent arguments advanced by each party.

## II. Claimant’s Opening Brief

In their opening brief, Claimant has advanced the following arguments:

**A. Small-Claims-Court Exclusion**

Spectrum argues that most if not all of the disputes fall within the jurisdiction of small claims courts. Claimants concede that under the arbitration clause, there is a “narrow carve-out for small-claims matters”, but the carve-out only applies to disputes that can be fully resolved in those courts.

Claimants maintain their forms of relief exceed the scope of small-claims jurisdiction since Claimants receive injunctive relief and punitive damages. Therefore, since Claimants request more than simple compensatory damages, the claims cannot be adjudicated in full in small claims courts but the AAA arbitration forum “is fully empowered to award the injunctive and punitive relief sought (subject to proof and the arbitrator’s authority under the contract and law)”.

**B. Statute of Limitations**

Spectrum argues that some claims are time barred pointing out that the billing practices began as early as 2010 and that under paragraph 28(b) of the Agreement, customers must bring any claim within one year of its accrual.

Claimants counter that this is a “classic merits issue” to be decided by a merits arbitrator, not a process arbitrator on a mass basis. Claimants also argue that the Agreement cannot override actual statutes of limitations particularly in the consumer context. “Courts have made clear that a company’s terms of service cannot simply shorten a statutory limitations period…without contemplating an unconscionability analysis”, citing as an example *Vianu v. AT&T Mobility LLC*, 2020 WL 3103797 (N.D.Cal. June 11, 2020) and *AWI Sec. & Investigators, Inc. v. Whitestone Constr. Corp.*, 164 A.D. 3d 43 (1st Dept. 2018).

Furthermore, a determination whether a consumer's claim is outside the statute of limitations will require an individualized analysis raising multiple issues, i.e., when did the customer first become subject to the charge; did the charge continue each month; did Spectrum conceal the nature of the fee impacting Claimants' discovery; etc.

In short, Claimants argue that all timeliness defenses be reserved for the merits phase.

**C. Documents-Only Hearing/Appropriate Arbitrator Selection**

Claimants have requested each arbitration be conducted solely on written documents unless a telephone or in-person hearing is later deemed necessary. Spectrum does not consent to a documents-only procedure for all cases. As to this, Claimants maintain that under AAA *Consumer Arbitration Rules*, when a claim seeks a relatively modest amount of damages, the "default" is arbitration based on documents-only unless the arbitrator decides a hearing is needed. Claimants state that under R-1(e) and R-29, if a claim does not exceed $25,000 the dispute "shall be resolved by the submission of documents only". Here, claims typically involve at most a few hundred or a few thousand dollars in refunds. Documents-only hearings will reduce time and expense for the parties and be more efficient and economical.

Claimants take the position that as to the selection of merits arbitrators, with 13,000 or more cases, the logistics of arbitrator assignment are complex but the AAA has procedures in its *Mass Arbitration Supplementary Rules* to manage large volumes "and the Process Arbitrator can facilitate discussions between the parties and the AAA on an appropriate method". Claimants assert that the AAA standard appointment process should be employed. Claimants also say that the Process Arbitrator "should guide the parties toward a fair system for appointment of arbitrators consistent with the AAA rules and the Arbitration Agreements. Claimants share the goal of

efficiency and suggest that following AAA's established mass-arbitration protocols (which may include phased scheduling of cases or the use of multiple arbitrators concurrently)" will best achieve that goal.

Claimants conclude requesting an order that:

1. No claims will be dismissed now based on the lack of (now moot) pre-arbitration notice, the small-claims-court jurisdictional exclusion, or the statute of limitations; and
2. The arbitrations will be administered under the AAA *Consumer Rules* including documents-only hearings by default and standard arbitrator appointment procedures.

## III. Respondent's Opening Brief

Respondent has submitted a detailed, lengthy (45 pages, 26 footnotes) brief. Although, in a footnote, Spectrum says it does not seek resolution on the merits at this time, a substantial portion of the brief is devoted to Respondent's defense that it, in fact, disclosed the existence of the fees at issue, i.e., the "broadcast TV surcharge" or "BTS".

For the sake of context, what follows is a brief summary of the factual and procedural history submitted by Spectrum.

The arbitration centers on the surcharge or "BTS" previously mentioned. In terms of Spectrum's cable TV packages, local broadcast network affiliates (local television stations owned by broadcast networks such as CBS, NBC and ABC) demand that Spectrum pay a fee to carry their signal, called a "retransmission consent fee". Spectrum recoups the broadcast fees it pays local affiliates through the BTS. Although Claimants charge that this is a "revenue grab", it is Spectrum's position that "the BTS is designed as a pass-through charge. There is no profit, administrative costs or other markup included in the BTS". In short, Spectrum says it is passing

on a fee it is obligated to pay local affiliates; this is not a process by which to surreptitiously collect more money from its customers.

Spectrum says it discloses the BTS in various ways such as promotional materials, subscription processes, its web page "and in every single monthly billing statement". Therefore, Spectrum asserts all of its customers are aware of or should be aware of the existence of that fee and have routinely made monthly payments to Spectrum year after year which indisputably includes the fee. Claimants, on the other hand, assert that Respondent has failed to disclose the BTS.

Claimants originally filed 15,694 "substantively identical arbitration demands" charging that Spectrum failed to disclose the BTS. Thereafter, 2,648 demands were voluntarily withdrawn as duplicative or because Claimants were not Spectrum subscribers. This leaves 13,046 demands which, Respondent says, "suffer from a number of threshold deficiencies that are ripe for procedural adjudication" under the AAA's *Mass Arbitration Supplementary Rules*.

In terms of the relief it seeks by way of this process arbitration, Spectrum lists the following categories of deficiencies:

1. Claimants who never paid the BTS lack standing. Only cable TV subscribers were charged the BTS – not those with internet, mobile, telephone or video streaming services. There are 785 Claimants who are not cable subscribers and who therefore should be dismissed.
2. Spectrum asserts that a "significant subset" of demands were untimely filed. Under Spectrum's Residential General Terms and Conditions of Service (the "Residential Terms"), any claim must be brought within one year of the claim arising. In short, Respondent says certain demands should be dismissed because they effectively violate the

statute of limitations. This assertion is multi-faceted. Within this category of Claimants, there are Spectrum customers who reside in a state where the one-year contractual limitations period is enforceable while there are other Claimants in states where the one-year limitation is not enforceable and who terminated service outside of this state's respective applicable limitations period. Moreover, under different state laws, the accrual point may be at the time of the customer's subscription or, alternatively, when they receive their first monthly itemized billing statement. All told, Respondent says that there are "at least 2,059 Claimants" whose demands were untimely filed.

3. Respondent argues that all or virtually all of the demands should be dismissed since they are subject to small claims court jurisdiction and, therefore, not arbitrable. Within the agreement, there is an arbitration clause prohibiting arbitration if the dispute can be resolved by a small claims court in the states where customers reside. Spectrum asserts that under MA Rule 6, an arbitrator is empowered to close such matters so they can be adjudicated in small claims court. Here, in an attempt to avoid small claims court, Claimants seek injunctive relief, prohibiting Spectrum from assessing its customers the BTS in the future, which Respondent asserts is not proper injunctive relief.

4. Assuming the process arbitrator dismisses the demands for the reasons set forth above as to any remaining demands, Spectrum proposes a series of bellwether arbitrations.[2]

---

[2] Attached as Appendix A is a document which describes Spectrum's requests setting forth the specific number of demands as to each category.

The Process Arbitrator will now address in detail, Spectrum's argument as to how this process arbitration should move forward and the basis for dismissing Claimants' demands.

Not surprisingly, Spectrum's position relies heavily on its "Residential Terms". Spectrum stresses that several provisions are relevant here. The two key provisions are an arbitration clause and a limitation of liability provision.

As to the arbitration clause, Spectrum maintains that it excludes any claims within a jurisdiction of a small claims court. As to the limitation of liability provision, Respondent argues that it requires any claims to be brought within one year after the claim arises and bars claims brought thereafter. The same provision, Spectrum asserts, also precludes recovery of "indirect, special, consequential, punitive or exemplary damages", meaning only actual damages. It is principally on the basis of these two provisions that Respondent seeks to dismiss the overwhelming bulk of the demands.

Respondent first takes on some low hanging fruit. Since only cable customers pay the BTS, non-subscribers are never charged the fee and have no standing to pursue the claims.

Spectrum then turns to the limitations period. This aspect of Spectrum's argument is complicated by the fact that the 13,000-plus Claimants are geographically disbursed living in states with different laws as to the enforceability of consumer contracts containing a limitations period and/or different statutes of limitations where consumer contracts, such as this, are enforceable. While Spectrum specifically addresses the statutes of limitations in states where there are a substantial number of customers, the key elements of Spectrum's argument are as follows[3]:

---

[3] The Claimants reside in more than 30 states. According to Spectrum, the "Top Ten" states account for 12,865 of the demands, roughly 98%. Those states are California, New York, Ohio, Florida, North Carolina, Wisconsin, Texas,

- Spectrum argues that whether the one-year limitations period in the terms of service is enforced or whether the various states' statutes of limitations are considered, a vast number of demands were not timely filed. Even if the longest statute of limitations is considered (six years), the overwhelming number of claims were filed outside of the statute of limitations and, therefore, should be dismissed.
- Spectrum argues that neither the discovery rule, nor any analogous tolling provision, saves these claims. Where Claimants allege that they did not know they would be charged a BTS before subscribing, a "cursory review of the first billing statement" would have provided notice because each monthly bill lists the BTS as an itemized charge.
- More than 5,236 of 13,046 Claimants no longer are Spectrum subscribers. Spectrum goes on to say that the demands of Claimants who disconnected their service outside of the applicable limitations period should be dismissed as untimely because they never relied upon the alleged misrepresentation, or charged the BTS, but paid the BTS.

As to Respondent's argument that demands subject to small claims jurisdiction should be closed, Spectrum relies on MA-6 which give process arbitrators the power to determine "[w]hether the cases should be closed and the parties shall proceed in small claims court". Moreover, the arbitration agreement specifically excludes claims within the jurisdiction of small claims courts from arbitration under §30.

In terms of the small claims court exclusion, Spectrum argues:

---

Kentucky, South Carolina and Maine. Spectrum focuses its arguments on the laws of these "Top Ten" states as to both the statute of limitations and as to small claims jurisdiction.

- Claimants should not be allowed to accept cable TV service aware of the BTS and years later sue for damages "for any money any reasonable Claimant should have known they were paying all along", citing ***Roling v. E*Trade Sec. LLC,*** 860 F. Supp. 2d 1035, 1039-40 (N.D.Cal. 2012). Accordingly, damages are limited to a one month charge.
- The highest monthly charge any time prior to the filing of the demands was $25.75. Even if Claimants can supplement actual damages with punitive or statutory awards, the amount in each case is within the jurisdictional limits of the small claims courts.
- Each demand states Claimants are seeking damages "up to $10,000.00". Claimants' own prayer establishes small claims court jurisdiction. There are 15 jurisdictions where small claims courts can hear cases seeking $10,000.00 or more.[4]
- Additionally, "[m]any more demands" are non-arbitrable because Claimants' "maximum theoretical recovery" is within their states' small claims jurisdiction. The most actual damages any Claimant can recover is the highest BTS charged to any subscriber for the entire limitations period. According to a chart provided by Respondent, that maximum number is $1,336.34. In short, even in the worst case scenario, Spectrum asserts that the damages fall well within small claims court jurisdiction.
- Claimants also seek punitive damages, which they say removes claims from small claims jurisdiction. Spectrum counters that several of the Top Ten states do not allow for the recovery of punitive, treble or other exemplary damages for violations of the consumer

[4] Tennessee, Texas, Minnesota, Georgia, California, Illinois, Indiana, New Hampshire, New Mexico, New York City (although not the state), North Carolina, Oregon, Washington, West Virginia and Wisconsin.

statutes underlying Claimants' demands.[5] Other states permit treble damages.[6] Even if Claimants in these states could show an entitlement to damages "the maximum theoretical recovery is well within their respective states' small claims court jurisdiction".

- Claimants' request for injunctive relief is flawed because they lack standing to seek an injunction and because the "All-In Pricing Rule precludes injunctive relief". As to the former, the arbitration agreement specifies that Claimants can only obtain injunctive relief on their own individualized basis [§30] as the Agreement allows injunctive relief only in favor of the party seeking it, only to the extent sought and only to the extent necessary to provide specific relief warranted by such individual's claim. Here, prospective relief will not redress any Claimants' harm as they have already paid the fees and are unquestionably aware of doing so. As to the "All-In Pricing Rule", 47 CFR §76.310(a)(b), Spectrum must comply with this FCC rule, and it has been in full compliance. An injunction requiring Spectrum to follow the law is superfluous. In summary, Spectrum contends that Claimants' request for injunctive relief is an inappropriate attempt to obviate the services agreement and that AAA does not have jurisdiction over claims subject to small claims court.

Finally, as to any demands which survive for merits determinations, Spectrum proposes 30 to 40 Bellwether hearings across a representative sampling based on the geographic concentration of Claimants, issues of law and fact, the length of time Claimants have been subscribers, and cancelled versus active subscribers.

---

[5] Wisconsin, Florida and Maine.

[6] Texas, North Carolina and South Carolina.

## IV. Claimants' Reply Brief

Claimants assert that Spectrum's opening brief is an expansive merits evaluation addressing substantive defenses such as the statute of limitations, standing and small claims jurisdictional carve-outs – issues not appropriate before the process arbitrator. Accordingly, this is a premature attempt to litigate merits issues, not administrative ones, under MA-6.

Claimants largely reiterate arguments previously advanced. That is, the small claims court exemption does not apply since Claimants seek relief exceeding the authority of those courts by requesting punitive damages to deter Spectrum's "ongoing deceptive billing practices". While conceding that individual claims "involve modest monetary amounts", Claimants' "broader remedial demands" exceed small claims court's jurisdiction. The AAA arbitration forum is designed for complex consumer claims which include conjunctive and punitive remedies.

As to the statute of limitations defenses, these require individualized, fact-sensitive inquiries for merits arbitrators and the development of an evidentiary record. Moreover, Spectrum's one year contractual limitation does not automatically override state consumer protection laws.

While Spectrum opposes a documents-only hearing structure, Claimants maintain that under AAA rules, disputes seeking damages under $25,000 "shall proceed by written submissions unless a merits arbitrator finds the hearing necessary". Therefore, the "default documents-only procedure", an efficient method, should be applied here.[7] As to Spectrum's reliance on the FCC's All-In-Pricing Rule, and its advocating for a bellwether process, Claimants argue that as to the

[7] R-29 of the AAA *Consumer Arbitration Rules* provides "[d]isputes *may be resolved* by submission of documents and without in-person or telephonic hearings". [Italics added.] There is no clear presumption, as the Process Arbitrator sees it, for or against documents-only procedures.

former, a determination that Spectrum complied with regulations requires extensive hearing, expert testimony and analysis; as to the latter, bellwether arbitrations are not contemplated by AAA rules nor permitted under the arbitration agreement which mandates individual arbitrations "without consolidation or representative proceedings".

## V. Spectrum's Response

Spectrum stresses that Claimants acknowledge their Demands are "low-dollar consumer claims" which total "at most a few hundred or a few thousand dollars[.]". Therefore, Spectrum reemphasizes that the claims are within the jurisdiction of small claims courts and are not subject to arbitration. That is, punitive damages are not a bar to small claims court jurisdiction and Claimants lack standing for injunctive relief since they face no future harm and money damages will suffice.[8]

Spectrum also insists that Claimants' demands for punitives are a "red herring". In six states[9], encompassing 5,008 demands, punitive damages are not recoverable under Claimants' statutory causes of action. In other states (Ohio, New York and South Carolina), small claims

[8] As to the availability of punitive damages in small claims, Spectrum harkens back to its opening brief which delineates relevant small claims statutes. With one minor exception (Hawaii), Spectrum maintains the statutes do not prevent the courts from considering punitives. On the other hand, Claimants cite no authority that small claims courts in 31 of the 33 jurisdictions involved lack such authority. Furthermore, the three jurisdictions referenced by Claimants (Colorado, Missouri and Ohio) allow small claims courts to impose punitive damages. Spectrum states that Claimants' reliance on Colorado law is "perplexing" since there are no Demands filed by Colorado residents. As to Missouri, the statute does not differentiate between types of damages and Missouri courts are permitted to hear all civil cases which do not exceed $5,000. Spectrum cites *Landum v. Livingston*, 394 S.W. 2d 573, 577 (Mo. App. 1965) which affirmed a punitive damage award in that state's predecessor to small claims courts. As to Ohio, Spectrum maintains that while its small claims courts do not typically have authority to award punitive damages, Ohio's Consumer Sales Practices Act – the sole cause of action for Ohio consumers – does not exclude actions seeking punitives.

[9] Florida, Maine, North Carolina. Texas,

courts retain jurisdiction in actions seeking "statutorily-enhanced damages". Therefore, 4,048 Claimants residing in those states can receive full relief.

As to injunctive relief – barring Spectrum assessing the BTS in the future – the claims suffer from "multiple threshold defects". Former subscribers lack standing since they do not face future harm; current subscribers lack standing because they know of the BTS and can cancel service; and even if Claimants have standing, no arbitrator could grant perspective relief contrary to the FCC's All-In Pricing Rule.

As to untimely demands, Respondent describes "three buckets" as time-barred. Spectrum reiterates the arguments previously advanced, i.e., these claims are untimely because they were not filed within the one-year contractual limitations, are barred by the Claimants' respective states' statute of limitations or are triggered by receipt of each customer's first bill. Spectrum emphasizes it is giving all Claimants the most beneficial accrual date, yet the overwhelming number of the claims are time-barred.

Finally, Spectrum turns to the hearing format. Citing the AAA's *Consumer Arbitration Rules*, contrary to Claimants' position, Spectrum argues that where no claims exceed $25,000.00, documents-only procedures may apply "unless any party requests an in-person or telephonic hearing". There is no "default" rule requiring "desk arbitration" when a party opposes a documents-only hearing – which Spectrum does. Spectrum has agreed to conduct hearings in a Claimant's home county relieving burden. Spectrum also argues that in-person bellwether arbitrations are the most efficient means to allow parties to assess the value of the demands.

**VI. Governing Rules**

As the parties are aware, this Process Arbitration is principally governed by the AAA's *Mass Arbitration Supplementary Rules* ["Rules"] formerly known as the *Supplementary Rules for Multiple Case Filings*. As set forth in its introduction, the *Supplementary Rules* [MA-1 to M-10] are designed to "streamline the administration of a large volume of filings involving the same party, parties and party representative(s), or related parties, parties and party representative(s)…". The *Supplementary Rules* supplement the other AAA Rules applicable to a dispute, such as in this case, the *Consumer Rules*. When inconsistencies exist among these *Supplementary Rules* and other AAA Rules, the *Supplementary Rules* govern. [MA-1(a)].

The role of a Process Arbitrator is set forth in MA-6 which is entitled "Challenges to Initial Administrative Determinations". Among other things, the Rule provides that after filing requirements have been met and prior to the appointment of merit arbitrators, any party may notify the AAA and the opposing parties that the party disagrees with the AAA's initial determination as to any administrative issues. [MA-6(a)]. Thereafter, the AAA in its sole discretion may decide whether or not to appoint a process arbitrator to hear and determine the administrative issue(s) for all of the cases included within the Mass Arbitration affected by such administrative issues. [MA-6(b)]. The Rule also grants the Process Arbitrator the power to rule on his or her own jurisdiction and the power to resolve any disputes over the applicability of this section MA-6 [MA-6(d)].

The Rule also states that the Process Arbitrator is empowered to determine certain specified issues. Those issues present here consist of the following (in the order in which they appear in the Rule):

1. The selection process for merits arbitrators [MA-6(c)(v)];
2. For cases under the *Consumer Arbitration Rules* (a) whether the cases should be closed and the parties proceed in small claims court; and (b) whether the merits arbitrators shall proceed by documents only or hold hearings [MA-6(c)(vii)]; and
3. The location of the merits hearings [MA-6(c)(viii)].

Additionally, the *Supplementary Rules* contemplate that when a matter is referred to a process arbitrator, this referral constitutes a preliminary step in the arbitration process. That is, the *Supplementary Rules* state that the Process Arbitrator's authority "shall cease upon the rendering of the process arbitrator's ruling" except when "new and different administrative issues arise upon which the parties disagree…". [MA-6(i)]. Once a process arbitrator has filled this limited role, the Rules contemplate that a merits arbitrator will be appointed. While a process arbitrator's rulings are final and binding on the parties and on merits arbitrator(s), nevertheless, "[a]dministrative issues" in individual cases may thereafter be decided by merits arbitrators. [MA-6(j) and MA-7]. In this particular arbitration, while the parties certainly have opposing viewpoints, they have agreed on a common set of administrative issues for which they seek a resolution from the Process Arbitrator. The resolution of those disputes will be set forth below.

## VII. Analysis and Findings

In the Process Arbitrator's view, Spectrum's principal and most detailed argument can be stated briefly as follows: Virtually all of the claims submitted by the Individual Claimants are routine, jurisdictionally-sound small claims court actions. The undersigned finds that this is a compelling argument and indeed those individual claims should be resolved by way of small claims court actions, not by arbitration. There are several reasons for this.

First, as set forth in the previous section of this Order and Opinion, the *Mass Arbitration Supplementary Rules* which govern this proceeding specify that a process arbitrator – in consumer cases such as this – has the authority to close (although not outright dismiss) appropriate cases so that they can proceed to small claims court. MA-6, the sole provision within the *Mass Arbitration Supplementary Rules* which addresses the actions of a process arbitrator, is explicit in this regard. Put simply, the rule empowers a process arbitrator ("shall have the authority to determine") to consider then rule on specific, enumerated issues. For cases under the *Consumer Arbitration Rules*, a process arbitrator has the authority to determine "[w]hether the cases should be closed and the parties proceed in small claims court…".

While under different circumstances, the dividing line between a "merits" issue and "administrative issue" may not be clear, such is not the case here. Without a doubt, small claims court jurisdiction is an administrative issue and, as such, a process arbitrator has the authority to determine whether claims filed in a consumer mass arbitration are more properly before a small claims court than an arbitrator. Therefore, the Process Arbitrator concludes that as a threshold issue, he has the responsibility and the authority to determine whether the individual claims should proceed within a mass arbitration setting or be decided by small claims courts.

Furthermore, the *Consumer Rules* contain additional provisions which address small claims court actions. Specifically, R-9(c) provides that after an Arbitrator is appointed, if a party wants to take a case to small claims court and notifies the opposing party and the AAA, then "it is up to the arbitrator to determine if the case should be decided in arbitration or if the arbitration case should be closed and the dispute decided in small claims court".

Accordingly, whether viewed within the context of the *Supplementary Rules for Mass Arbitration* or the *Consumer Rules* which also govern this case, an arbitrator is empowered to make a determination – when considering a demand submitted by a single individual or multiple claimants – as to whether a claim has been properly submitted to and belongs in an arbitrable forum or must be closed and then resolved by a small claims court.

Moreover, since arbitration is a creature of the agreement between and among the parties, it is proper to look to that agreement to determine the parties' respective rights and obligations. Section 30 of the Agreement between Spectrum and its customers provides, in pertinent part:

EXCLUSIONS: SUBSCRIBER AND SPECTRUM AGREE THAT THE FOLLOWING CLAIMS OR DISPUTES SHALL NOT BE SUBJECT TO ARBITRATION:

(1) ANY INDIVIDUAL ACTION BROUGHT BY SUBSCRIBER OR BY SPECTRUM ON ANY MATTER OR SUBJECT THAT IS WITHIN THE JURISDICTION OF A COURT THAT IS LIMITED TO ADJUDICATING SMALL CLAIMS.

Claimants concede that Spectrum's services agreement with its customers indeed contains this limiting provision within its arbitration clause, but they insist that it simply represents a "narrow carve-out for small-claims matters". This is hardly a narrow carve-out but one, in the Process Arbitrator's view, which contractually obligates Claimants to file their actions within their respective states' small claims courts.

Nevertheless, Claimants argue that by filing demands which include punitive damages and injunctive relief, they have established that their claims are not subject to small claims court jurisdiction. Therefore, Claimants argue, even if this issue were to be decided by a process arbitrator, that process arbitrator should conclude that by closing these cases and sending these matters to small claims court is inappropriate since Claimants cannot obtain "complete relief".

As to punitive damages, however, in the Process Arbitrator's view, Spectrum has successfully shown (virtually on a state-by-state basis) that the overwhelming number of small claims courts from coast to coast and within the jurisdictions relevant to this matter have the authority to award punitive damages or, alternatively, under the relevant pertinent statutes, no such entitlement exists. Additionally, Spectrum makes a salient point – effectively acknowledged by Claimants – that the amount of monetary damages they have pled ("up to" $10,000), even allowing for punitive or exemplary damages, falls within the jurisdiction of these courts. Indeed, Claimants concede that their demands are individually modest, constituting "low-dollar consumer claims" which at best total "a few hundred or a few thousand dollars".

In a similar vein, the Process Arbitrator finds that Claimants' prayer for injunctive relief is unsustainable. The fulcrum of Claimants' charges against Spectrum is that the company has added unexpected, hidden charges on a monthly basis and (presumably) seeks an order from a merits arbitrator directing Spectrum to cease this practice.[10] However, as Spectrum emphasizes, having paid these unexpected, hidden charges month after month for varying lengths of time but often for many years, and then having filed demands for arbitration based as to the payment of those monthly fees, Claimants cannot contend that the fees paid by them over time remain hidden or unexpected. Instead, to the extent that Claimants have been damaged by paying these fees, they could be fully compensated ("made whole") by monetary relief, not any form of an injunction. Moreover, Claimants have failed to supply any authority for the proposition that an arbitrator,

[10] The Process Arbitrator assumes that Claimants' Demands for Arbitration uniformly include injunctive relief of this nature. This is based upon the parties' respective briefings. Although requested, the Process Arbitrator has not been provided by the parties with a sample of a Demand for Arbitration.

deciding a breach of contract claim, is empowered to enjoin a litigant from charging fees for *future* services.

Viewing this, even in the most favorable light to Claimants, the Process Arbitrator finds that the demands for punitive damages and injunctive relief are an ineffective effort to avoid litigating claims in small claims courts for cases which should be litigated there. Tacking on claims for punitive damages and/or injunctive relief do not transform causes of action based in contract into more extensive litigation. Otherwise, a claimant could universally avoid small claims court jurisdiction by seeking punitive damages or injunctive relief simply by adding them to a demand for arbitration obviating the parties' agreement and the rules of arbitration. Accordingly, the Process Arbitrator finds that Claimants' position that small claims courts are without jurisdiction to address punitive damages or injunctive relief fails to support the proposition that the claims must be arbitrated due to the absence of complete relief in small claims court.

Having ruled in this manner, it is not clear to the Process Arbitrator[11] whether there remain any surviving claims which should remain open and continue to be arbitrated. Given this, the Process Arbitrator will briefly address what appear to be the open issues as to any Claimants who remain.

Spectrum contends that many of the claims are time-barred under either (a) the terms of the customer service agreement or (b) under the various states' statutes of limitations or (c) both.

[11] While it appears that this ruling may result in the closure of all Claimants' demands, the parties' submissions are equivocal in this regard. For example, while Spectrum in its briefing requests that "[a]ll of the Demands be closed" [p. 3 of Respondent's opening brief], it also seeks dismissal of "7,055 Demands in Exhibit 7" [p. 4, Respondent's opening brief] and in its letter of December 27, 2024 to AAA, Spectrum sought a Process Arbitrator to address filing and jurisdictional defenses "warranting the closure of most, if not all, of the cases and the refiling of the few that may survive". Similarly, Claimants described Spectrum's position to the effect that "most of the claimants' disputes fall within the jurisdiction of State small claims courts" [p. 4, Claimants' opening brief]. Therefore, the Process Arbitrator has chosen to address the potential remaining issues.

To the extent this argument applies to any Claimants who remain, the Process Arbitrator finds that this is an issue which must be determined by a merits arbitrator. First, under the *Mass Arbitration Supplementary Rules*, specifically MA-6, a determination as to whether a claim was timely filed is not one of the enumerated administrative issues process arbitrators have been given the authority to decide. Secondly, whether an individual party has filed a claim within a contractually-based limitations period or under a state's law as to a statute of limitations, is a fact-sensitive determination which undoubtedly will vary on a case-by-case basis. While a statute of limitations defense is sometimes arguably "procedural" in nature, it is not in the Process Arbitrator's view "administrative" as defined by the AAA rules but substantive. Consequently, under these circumstances, this is an issue which can and should be decided by a merits arbitrator.[12]

Spectrum also asserts that another category of Claimants are comprised of customers whose services included either internet, phone or streaming services but not cable television. Only cable television customers paid the BTS which is the subject matter of this dispute. Spectrum goes on to say that nevertheless, 785 Claimants who are not Spectrum cable subscribers have filed demands and, therefore, remain Claimants in this Arbitration. Spectrum, of course, asserts that these 785 are without standing.

In the Process Arbitrator's view, not only do these Claimants lack standing, they are effectively strangers to the arbitration and have no legitimate basis to have filed the demands.

[12] While there is no clear, binding authority in this regard, the few courts which have addressed AAA Mass Claims Arbitration emphasize that a process arbitrator is positioned to decide administrative issues only. That is, the AAA utilizes Mass Claims Arbitration solely for procedural and administrative reasons. "AAA created rules for multiple case filings in 2021 'to address party disputes about the administrative process…such as which rules would apply if there is a dispute between the parties'. These dispute are 'addressed…by the process arbitrator, [whose] decision…[applies] to all the cases'. 'Only administrative issues may be submitted to the [p]rocess [a]rbitrator for determination'". See, *Buzzfeed Media Enters. v. Anderson*, 2024 Del. Ch. LEXUS 188 *(May 15, 2024); *Mosley v. Wells Fargo & Co.*, 2023 WL 3185790* (S.D.Cal. May 1, 2023).

Accordingly, the Process Arbitrator finds that Claimants who are not Spectrum cable subscribers and who therefore did not pay the BTS are not properly parties to this Arbitration and should be dismissed at this juncture.

One last possible remaining aspect of this Process Arbitration is the issue of the hearing format. As set forth previously, this issue only has significance if any Claimants remain. Nevertheless, the Process Arbitrator makes the following ruling with respect to the hearing format.

As to the disputes regarding "documents only" hearings, which Claimants favor but Respondent objects to, at least on a global basis, a review of the AAA rules generally show that the hearings envisioned for arbitration normally require attendance by a participant (party) and/or their representative. For example, *Consumer Rules*, 26-28, 30-32, 34 and 38-41 all address some aspect of an in-person, telephonic or video hearing – "Setting the Date, Time and Place…of Hearing", "Written Record of Hearing", "Interpreters", "Attendance at Hearings", "Oaths", "Conduct of Proceedings", "Evidence", "Postponements", "Arbitration in the Absence of a Party of Representative", "Closing of Hearing", and "Reopening of Hearing".

R-29, however, entitled "Documents-Only Procedure" reads:

> Disputes *may be resolved* by submission of documents and without in-person or telephonic hearing. For cases being decided by the submission of documents only, the procedures for the *Resolution of Disputes through Document Submission* (found at the end of these Rules) shall supplement these rules. These Procedures will apply where no disclosed claims or counterclaims exceed $25,000 (R-1(g)), unless any party requests that in-person or telephone hearing or the arbitrator decides that a hearing is necessary. [Emphasis added.]

In turn, the procedures previously referenced in R-29 are contained in D-1 through D-4, (p. 41 of the *Consumer Rules* Amended and Effective September 1, 2014 which apply here). In pertinent part, D-1(b) states:

> Where no disclosed claims or counterclaim exceed $25,000, the dispute shall be resolved by these Procedures, *unless a party asks for a hearing or the Arbitrator decides that a hearing is necessary.* [Emphasis added.]

Here, Claimants effectively concede that no disclosed claim exceeds the $25,000 limit which would provide the option of a "Documents-Only Procedure". However, as Spectrum correctly argues, this option is not mandatory, nor the "default" option. Instead, the rules implicitly contain a presumption that an arbitration will generally (although not always) progress to an oral evidentiary hearing in the form of a virtual, in-person or telephonic hearing.

To sum this up, MA-6(c)(vii) b) gives a process arbitrator the authority to determine whether merits arbitrators shall proceed by documents-only or hold hearings; the *Consumer Rules* anticipate in-person hearings; and the *Consumer Rules* [in D-1] provides the option of a documents-only hearing in the case of claims less than $25,000 *unless* a party objects *or* an arbitrator (presumably a merits arbitrator) decides a hearing is necessary. Given the Process Arbitrator's determination in this matter, and without knowing which if any claims may remain for arbitration, the Process Arbitrator finds that a decision as to whether or not to employ documents-only hearings is premature. In the event that there are remaining claims which will move forward in this Arbitration, the Process Arbitrator will subsequently make a decision as to whether or not it is appropriate to hold in-person as opposed to documents-only hearings before a merits arbitrator.[13]

[13] This determination also applies to the method of appointing merits arbitrators.

## VIII. Conclusion

For the reasons previously set forth, it is the finding of this Process Arbitrator that the Individual Claimants' cases should be closed and that the parties proceed in small claims court. Additionally, those claims brought on behalf of individuals who are not Spectrum cable subscribers and who did not pay the BTS are hereby forthwith dismissed. Finally, if there are any claims which remain after this decision, those claims shall proceed as set forth above.

*Dennis M. Cavanaugh*
DENNIS M. CAVANAUGH
Process Arbitrator

Dated: July 23, 2025

# APPENDIX A

**(Spectrum's Requests Re: Claimants' Demands)**

1. 785 demands dismissed because Claimants did not pay the BTS the last 7 years [Exhibit 2].

2. 741 demands dismissed as time barred under Residential Terms' one-year limitations [Exhibit 3].

3. 1,611 demands dismissed as time barred because Claimants did not subscribe to cable service prior to applicable statute of limitations [Exhibit 4].

4. 2,059 demands dismissed as time barred because claims accrued prior to the applicable limitations period [Exhibit 5].

5. All demands be closed as they must proceed in small claims court because damages are limited to one month of the BTS triggered no later than first monthly billing and declined to terminate the service.

6. 7,055 demands as non-arbitrable under Residential Terms and must proceed in small claims court because prayer for damages up to $10,000 is less than applicable small claims jurisdictional limit [Exhibit 7].

7. 9,378 demands closed as they are non-arbitrable under the Residential Terms because Claimants' maximum hypothetical damages fall within small claims court jurisdiction given their respective statutes of limitations.

8. As to any remaining demands, Bellwether arbitrations.